**Larry Darnell HATLEY, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 06–05–00013–CR.

Court of Appeals of Texas, Texarkana.

Submitted Aug. 10, 2006.

Decided Aug. 25, 2006.

Jeffery P. Buchwald, Dallas, for appellant.

F. Duncan Thomas, Dist. Atty., Kelli M. Aiken, Asst. Dist. Atty., Greenville, for appellee.

Before MORRISS, C.J., ROSS and CARTER, JJ.

## OPINION

Opinion by Justice CARTER.

On September 12, 2003, a Hunt County grand jury indicted Larry Darnell Hatley for capital murder. The indictment specifically alleged Hatley, on July 18, 2003,

individually and acting as a party to the offense with Lauron Bernard Willis and Cedrick Lamone Lewis, did then and there intentionally and knowingly cause the death of an individual, Edi Cruz Garcia by shooting him with a firearm, and the murder of Edi Cruz Garcia was committed intentionally in the course of committing or attempting to commit robbery. . . .

Later, the State formally waived its intent to seek the death penalty.

By April 13, 2004, the State and Hatley had reached a negotiated plea agreement,[1] calling for Hatley to plead guilty to the lesser offense of aggravated robbery in exchange for his truthful testimony against his codefendants (Willis and Lewis) regarding the robbery-murder. Hatley also agreed that, if he failed to "fully cooperate with the State of Texas," all negotiated plea agreements would be cancelled. Punishment was to be submitted to the trial court. The trial court accepted Hatley's plea, ordered a presentence investigation, and scheduled sentencing for May 27, 2004. The May sentencing date was, however, eventually postponed.

On September 10, 2004, the State filed a written motion to set aside the negotiated plea agreement with Hatley. The motion stated, in relevant part:

2. During preparations for the trial of a co-actor, the State developed serious concerns about the truthfulness of the defendant's statement based on physical evidence and statements from other witnesses. In order to ensure the State would only be putting forth truthful evidence, the State informed the defendant, in the presence of his attorney, that he would be required to take a polygraph examination to determine whether or not he was being truthful. The defendant initially agreed to take the polygraph examination. However, when investigators from the District Attorney's Office went to the jail to transport the defendant to the examination, he refused to go with them to attend the polygraph examination.

3. The State would show that the defendant has violated the condition of his plea agreement by not being truthful and not fully cooperating with the State. We request that the Court set aside the plea agreement and set the defendant's case back on the jury trial docket.

The trial court conducted a hearing on the State's motion September 30, 2004. At that hearing, the State put forth evidence Hatley had refused to submit to the State's requested polygraph examination. In fact, Hatley himself admitted he had refused to cooperate with the polygraph request. The trial court granted the State's motion and ordered the withdrawal of the parties' agreement. Hatley would now face the charges specified in the original indictment.

Two months later, a jury was empaneled to decide Hatley's fate on the capital murder charge. That jury found Hatley guilty of capital murder. Hatley's sentence was automatically set at imprisonment for life. *See* Tex. Pen.Code Ann. § 12.31 (Vernon

---

1. Hatley had previously rejected an offer from the State. The State's first offer would have allowed Hatley to plead guilty to murder, with punishment on the lesser-included first-degree felony being submitted to the trial court.

2003).[2] Hatley now appeals, raising four points of error. We affirm.

## I. Corroboration of Accomplice–Witness Testimony

■ In his first point of error, Hatley contends there is insufficient independent evidence to corroborate the testimony of the accomplice witness, Lewis. The State counters there is copious evidence corroborating Lewis' testimony.

■ "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." TEX.CODE CRIM. PROC. ANN. art. 38.14 (Vernon 2005). While required by neither common law nor our state and federal constitutions, Article 38.14's codification reflects the Texas Legislature's determination that accomplice-witness testimony implicating another "should be viewed with some level of caution." *Gill v. State*, 873 S.W.2d 45, 48 (Tex.Crim.App.1994); *see also Brown v. State*, 159 S.W.3d 703, 707 (Tex.App.-Texarkana 2004, pet. ref'd), *cert. denied*, —— U.S. ——, 126 S.Ct. 485, 163 L.Ed.2d 369 (2005) (discussing covert witness rule of Article 38.141 and its parallels to Article 38.14's accomplice-witness rule). Article 38.14 requires the corroboration of accomplice-witness testimony, but there is no exact rule as to the amount of evidence required for corroboration. *Dowthitt v. State*, 931 S.W.2d 244, 249 (Tex.Crim.App. 1996). "All that is required is that there be *some* non-accomplice evidence which

*tends* to connect the accused to the commission of the offense alleged in the indictment." *Gill*, 873 S.W.2d at 48; *see also Jeffery v. State*, 169 S.W.3d 439, 448 (Tex. App.-Texarkana 2005, pet. ref'd) (covert witness case, but analysis for corroboration of covert witnesses and accomplice witnesses is same); *Brown*, 159 S.W.3d at 707–08. Such evidence may be either direct or circumstantial. *Reed v. State*, 744 S.W.2d 112, 126 (Tex.Crim.App.1988).

■ The test for weighing the sufficiency of corroborating evidence is to eliminate from consideration the accomplice's testimony, and then examine the remaining testimony and evidence to determine if there is evidence that tends to connect the defendant with the commission of the offense. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex.Crim.App.1993); *Reed*, 744 S.W.2d at 125; *Hall v. State*, 161 S.W.3d 142, 149 (Tex.App.-Texarkana 2005, pet. ref'd). The nonaccomplice testimony does not have to directly link the accused to the crime, it alone need not establish guilt beyond a reasonable doubt, nor must the corroborating evidence prove all the elements of the alleged offense. *Gill*, 873 S.W.2d at 48; *Munoz*, 853 S.W.2d at 559; *Reed*, 744 S.W.2d at 126; *Jeffery*, 169 S.W.3d at 448. The accused's presence at the scene of the crime is, by itself, insufficient to corroborate an accomplice's testimony. However, "evidence that an accused was in the company of the accomplice close to the time of the offense, coupled with other suspicious circumstances, may tend to connect the accused to the offense." *Gill*, 873 S.W.2d at 49;

---

**2.** In 2005, the Texas Legislature amended Article 12.31 to make the punishment for capital murder (for cases in which the State did not seek the death penalty or in which the jury did not make affirmative findings regarding the statutory special issues) imprisonment for life without the possibility of parole. *See* Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 1, 2005 Tex. Gen. Laws 2705. This change applies only to offenses committed on or after September 1, 2005. *See* Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 17, 2005 Tex. Gen. Laws 2705, 2709.

see also *Reed*, 744 S.W.2d at 127; *Jeffery*, 169 S.W.3d at 447; *Brown*, 159 S.W.3d at 708. Moreover, while evidence that addresses only motive or opportunity to commit the crime is, by itself, insufficient to corroborate the accomplice-witness testimony, motive or opportunity evidence may be considered in conjunction with other evidence tending to connect the accused to the crime. *Reed*, 744 S.W.2d at 127. "Cumulative evidence of 'suspicious circumstances' may be sufficient even if none of the circumstances would be sufficient individually." *Jeffery*, 169 S.W.3d at 447; *see also Brown*, 159 S.W.3d at 708. In the end, every case "must be considered on its own facts and circumstances— on its own merit." *Munoz*, 853 S.W.2d at 559; *see also Reed*, 744 S.W.2d at 126.

### 1. The Nonaccomplice–Witness Evidence

Viewed in the light most favorable to the jury's verdict, the nonaccomplice-witness evidence in the case now on appeal established:

(a) Edi Cruz Garcia died as a result of being shot multiple times with a .380 semi-automatic pistol;

(b) medical examiners ruled Garcia's death a homicide;

(c) police recovered a Davis Industries .380 semi-automatic pistol near the location described by Hatley's codefendant Willis during Willis' custodial interrogation;

(d) ballistics testing indicated the Davis Industries .380 semi-automatic weapon recovered by police and admitted into evidence at trial was the same weapon used to kill Garcia;

(e) Hatley told Tamara McMurray that he had witnessed someone being shot on the afternoon in question, an inculpatory statement that places Hatley at the crime scene;

(f) Hatley's counsel admitted during trial that Hatley had participated in the robbery of Garcia and the other victims;

(g) following his flight from the crime scene, Hatley called McMurray and asked her to drive him to his aunt's house where Hatley then changed clothes;

(h) while Hatley was with McMurray, he told her that he had not shot anyone, but that Willis had shot someone, which further suggests Hatley was at the crime scene;

(i) one of the eyewitnesses said two of the robbers wore white T-shirts while the third wore a red or orange shirt;

(j) Hatley had been wearing a red shirt before he changed clothes;

(k) Hatley had a red shirt in his possession after he changed clothes at his aunt's house;

(*l*) Hatley was found a few hours following the murder in a vehicle from which police recovered a red shirt and a black "dew rag" underneath the front passenger seat of the car;

(m) Hatley, through counsel, admitted having fled the scene of the crime once shots were fired;

(n) a police tracking dog tracked Hatley's scent from the immediate crime scene to a point by some nearby railroad tracks;

(*o*) Hatley told his mother that he thought his codefendant was not supposed to take out the gun during the robbery, a statement which suggests Hatley had foreknowledge of the robbery plan and that the accomplice had a gun;

(p) Ishmael Perez, another of the robbery victims, testified that all three robbers actively participated in the robbery: one person held the gun, one person fished through the victims' pockets, and

the third person stood guard as a lookout; and

(q) the jury watched a videotape of Hatley's custodial interview. During this interview, Hatley admits going to Lewis' apartment in the early afternoon of July 18, 2003. There, Hatley, Lewis, and Willis played video games. They then left to go to Hatley's apartment. En route to Hatley's apartment, Lewis and Willis told Hatley about a group of Hispanics that Lewis and Willis had seen "around the corner." Hatley then admitted the three planned to go "ask" these Hispanics for some money, but if the Hispanics did not give Hatley, Lewis, and Willis any money, the three would "snatch it and run." Finally, as part of this videotaped interview, Hatley admits to having conspired with Lewis and Willis to commit the robbery of the three Hispanic men.

### 2. The Accomplice–Witness Evidence

Lewis testified that he, Willis, and Hatley all lived at the Ponderosa Apartments. Lewis admitted that, as a result of his involvement in the July 18, 2003, robbery and murder of Garcia, Lewis had been adjudicated a juvenile delinquent and ordered to serve a twenty-year determinate sentence. Lewis told the jury that, on the afternoon of July 18, 2003, he and Willis had been playing video games at Lewis' apartment. Hatley arrived that afternoon and was wearing a red T-shirt, a black "dew rag," and some gray basketball shorts. Hatley took Lewis and Willis into another bedroom and asked them to look out the window at a group of Hispanics in the commons area below the window. According to Lewis, Hatley then asked Lewis and Willis if they wanted to go down and "get" the Hispanics. Lewis' remaining direct testimony establishes that the three then went to Hatley's apartment, where Hatley masterminded the robbery, provid-

ed the gun to be used in the commission of the robbery, and told Lewis and Willis that they would call McMurray to pick them up after the robbery was completed. According to Lewis, all three then walked down the stairs together and out toward the Hispanic men in the commons area. All three then participated in the robbery in which Willis wielded the gun. Once the first shot was fired, Lewis testified he and Hatley ran toward the woods, leaving Willis behind at the scene briefly before Willis fired the next shot and then ran. Once the three were away from the immediate crime scene, Willis gave the gun to Hatley, who (according to Lewis) then hid the gun near the railroad tracks. The three then separated.

### 3. Analysis and Conclusion

Hatley contends his flight at the time of the crime was reasonable because "[m]ost reasonable and innocent people would seek to escape the scene of a shooting if possible." This argument has logical impact, but the contrary argument—that "[T]he wicked flee when no man pursueth; but the righteous are bold as a lion," *Proverbs* 28:1—has equal validity. Hatley also notes that his presence in the commons area of the apartment complex was not, by itself, suspicious because the commons area was a public space. We cannot disagree. Hatley then asserts that none of his statements to his mother indicate an intent to help Lewis and Willis rob or murder Garcia. We, however, do disagree with this assertion. Hatley's statement to his mother that Willis was not supposed to take out the gun during the robbery amounts to a two-fold admission: First, Hatley knew *before* the robbery that Willis had the gun. Second, the fact that Hatley had such foreknowledge suggests Hatley participated in planning the robbery. Accordingly, we believe that Hatley's statement to his mother does serve to corrobo-

rate Hatley's involvement in the robbery. And, finally, Hatley's admission in the custodial interview to planning and executing the robbery serves to corroborate the accomplice-witness testimony.

Given all the facts and circumstances in this case, both the direct and circumstantial evidence, we conclude that the nonaccomplice-witness testimony was sufficient to connect Hatley to the commission of the robbery. Therefore, we overrule Hatley's first point of error.

## II. Factual Sufficiency of the Evidence

■ In his second point of error, Hatley contends the evidence is factually insufficient to support the jury's verdict. The factual sufficiency standard for guilt requires the reviewing court to ask whether a neutral review of all the evidence demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or whether the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex. Crim.App.2000).

Hatley argues that Lewis' testimony is not credible because Lewis received a lesser sentence in exchange for his testimony. Hatley also points out inconsistencies between Lewis' statement to police and Lewis' trial testimony.

■ At trial, Lewis admitted he had lied several times in his statement to Ranger Jeffrey Collins because the sixteen year old was scared and because he thought that, if he lied (to minimize his involvement), he would get to go home that night. It is well understood that a witness' credibility is greatly undermined when it is revealed he or she has given contradictory or inconsistent statements regarding facts at issue. *See, e.g.,* TEX.R. EVID. 613(a); *Staley v. State,* 888 S.W.2d 45, 49–50 (Tex.App.-Tyler 1994, no pet.);

BLACK'S LAW DICTIONARY 768 (8th ed.2004) (defining impeach). Nonetheless, it is not the province of this Court when conducting a factual sufficiency review to substitute its assessment of witness credibility for the jury's assessment. *See, e.g., Johnson v. State,* 23 S.W.3d 1, 7 (Tex.Crim.App.2000); *Paita v. State,* 125 S.W.3d 708, 716–17 (Tex.App.-Houston [1st Dist.] 2003, pet. ref'd); *Crutcher v. State,* 969 S.W.2d 543, 545 (Tex.App.-Texarkana 1998, pet. ref'd). Instead, we are to consider *all* the evidence and weigh the evidence supporting the jury's verdict against the contrary evidence. Here, the combined weight of the evidence (which we outlined above) overwhelmingly supports Hatley's conviction, especially in light of (1) his confession to planning and participating in the underlying robbery, and (2) our law of parties, *see* TEX. PEN.CODE ANN. § 7.02(b) (Vernon 2003), which makes Hatley guilty of Garcia's murder due to Hatley's involvement as one of the conspirators participating in the underlying aggravated robbery. *Cf. Crutcher v. State,* 969 S.W.2d at 545–46 (evidence sufficient to support deadly weapon finding even though appellant did not personally use flashlight to beat victim, he was criminally responsible for coconspirator's use of weapon). We overrule Hatley's second point of error.

## III. Setting Aside the Negotiated Plea Agreement

■ In his third point of error, Hatley contends the trial court erred in setting aside the negotiated plea agreement of April 13, 2004. Hatley asserts that the negotiated plea agreement's use of the phrase "fully cooperate" was understood by the parties to mean only that he would testify truthfully against his codefendants. Because Hatley's refusal to submit to a polygraph examination was conduct outside of his obligation to testify against his

codefendants at their trial(s), the polygraph refusal should, according to Hatley's appellate argument, not be considered a breach of his negotiated plea agreement. The State counters that the need for Hatley to submit to the polygraph examination was part and parcel of his continuing obligation to testify truthfully pursuant to the negotiated plea agreement. The State argues it needed for Hatley to testify truthfully, and the polygraph was the State's insurance that Hatley's testimony would, in fact, be truthful. Therefore, when Hatley refused to cooperate with the polygraph, he breached the negotiated plea agreement.

■■■■ Once a negotiated plea agreement is formally accepted by the trial court, a binding contractual relationship exists between the State and the defendant. *Ortiz v. State*, 933 S.W.2d 102, 104 (Tex.Crim. App.1996); *Wright v. State*, 158 S.W.3d 590, 593–94 (Tex.App.-San Antonio 2005, pet. ref'd). The Texas Court of Criminal Appeals has written that a defendant is entitled to specific performance of a negotiated plea agreement once that plea agreement has been accepted by the trial court, unless, of course, specific performance is impractical; in such cases, the defendant should be permitted to withdraw his or her plea. *Perkins v. Third Supreme Judicial Dist. of Tex., at Austin*, 738 S.W.2d 276, 283 (Tex.Crim.App.1987). Consequently, where the State or a trial court has refused to comply with a negotiated plea agreement (which has been previously accepted by that trial court), defendants have been able to successfully seek specific enforcement of the agreement, where practicable. *See, e.g., id.* at 277–78 & 285; *Wright*, 158 S.W.3d at 594–95. Such a maxim should be of equal benefit to

the State. *See Ricketts v. Adamson*, 483 U.S. 1, 9–12, 107 S.Ct. 2680, 97 L.Ed.2d 1 (1987) (Arizona entitled to seek prosecution of original charge of capital murder, and seek death penalty, once defendant breached agreement to truthfully testify against codefendants).

■■■■ Because a negotiated plea agreement is a contract between the parties, we generally turn to the rules applicable to contract construction to resolve disputes about the meaning of a negotiated plea agreement. *See generally Ex parte Adkins*, 767 S.W.2d 809, 810 (Tex.Crim. App.1989).[3] Contract construction is a matter of law. *See Elliott–Williams Co. v. Diaz*, 9 S.W.3d 801, 803 (Tex.1999). "A court's primary concern is to ascertain and give effect to the parties' intentions as expressed in the instrument." *Diaz*, 9 S.W.3d at 803. "Whether a contract is ambiguous is a question of law for the court to decide by looking at the contract as a whole in light of the circumstances present when the contract was entered." *Hawthorne v. Countrywide Home Loans, Inc.*, 150 S.W.3d 574, 577 (Tex.App.-Austin 2004, no pet.) (citing *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex.1995)). "Only when a contract is first determined to be ambiguous may the courts consider the parties' interpretation and consider extraneous evidence to determine the true meaning of the instrument." *Hawthorne*, 150 S.W.3d at 577 (citing *Nat'l Union Fire Ins. Co.*, 907 S.W.2d at 520).

In this case, the written negotiated plea agreement called for two things: (1) for Hatley to testify truthfully against his codefendants and (2) for Hatley to fully cooperate with the State. Hatley now asks this Court to read ambiguity into the phrase

---

**3.** The rules of contract interpretation may not be employed to analyze negotiated plea agreements when to do so would be to the detriment of due process. *Adkins*, 767 S.W.2d at 810. Hatley makes no due process arguments in this appeal.

"fully cooperate" and, because the phrase is confusing, to strictly construe that phrase against the State. At the time the agreement was entered into, the cases for Hatley's codefendants had not yet gone to trial. The State needed Hatley's cooperation to prosecute those codefendants, and, in exchange, Hatley would assuredly evade a capital conviction.[4] With this context in mind, we turn to the wording of the negotiated plea agreement.

"Cooperate" means "to work or act together." WEBSTER's II NEW COLLEGE DICTIONARY 248 (2d ed.2001). "Fully" means "[t]o a complete extent." WEBSTER's II NEW COLLEGE DICTIONARY 452 (2d ed.2001). Accordingly, the terms of the negotiated plea agreement required Hatley to work together to a complete extent with the State. There is nothing ambiguous about such a requirement. It matters not that the parameters of Hatley's required cooperation were not further delineated: the adverb "fully" sufficiently defined the scope of Hatley's expected cooperation. Because we do not hold the phrase "fully cooperate" to be ambiguous in light of the circumstances present when the negotiated plea agreement contract was entered into, we need not look to extrinsic evidence to determine the meaning of that agreement.

Based on Hatley's agreement, the State was entitled to have Hatley testify truthfully. It is common knowledge that polygraph examinations are used to verify the accuracy of a statement of a witness—even though such examinations are not generally admissible evidence. We find that, since Hatley had agreed to testify truthfully and cooperate fully, the State could reasonably require that Hatley undergo a polygraph examination to test the truthfulness of his statement.

The plain language of the written agreement called for Hatley to fully cooperate with the State. Hatley testified he had refused to submit to the polygraph examination. Thus, Hatley broke the agreement. Because it would be impractical for the trial court to force Hatley to submit to the polygraph examination or otherwise "fully cooperate" with the State, the State's sole remedy in this case was to have the plea agreement withdrawn, which the trial court did. No error has been shown. We overrule Hatley's third point of error.

## IV. Admission of Evidence Regarding Complainant's Children

In his final issue, Hatley contends the trial court erred by admitting evidence regarding the age of the complainant's surviving children during the guilt/innocence phase. We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Osbourn v. State*, 92 S.W.3d 531, 537 (Tex.Crim.App.2002). A trial

4. At the time of Hatley's trial, a person convicted of a (nondeath penalty) capital felony was not eligible for parole until his or her actual time served equaled forty years. TEX. GOV'T CODE ANN. § 508.145 (Vernon 2004) (amended). *See* Act of May 8, 1997, 75th Leg., R.S., ch. 165, § 12.01, 1997 Tex. Gen. Laws 327, 425–26, *amended in part & repealed in part by* Act of May 28, 2005, 79th Leg., R.S., ch. 787, §§ 4, 12, 2005 Tex. Gen. Laws 2705, 2708; *see also* Act of May 23, 1997, 75th Leg., R.S., ch. 665, § 3, 1997 Tex. Gen. Laws 2247, 2248. Because Hatley's offense occurred before the effective date of the amendment, Hatley's parole eligibility will be governed by the law in effect as of July 18, 2003. *See* Act of May 28, 2005, 79th Leg., R.S., ch. 787, § 17, 2005 Tex. Gen. Laws 2705, 2709. If Hatley had been convicted of the lesser offense of aggravated robbery, he would have been eligible for parole when the actual calendar time he had served, without consideration of good conduct time, had reached thirty years or half his sentence, whichever was less. TEX. GOV'T CODE ANN. § 508.145(d) (Vernon 2004) (amended). *See* Act of May 8, 1997.

court abuses its discretion if it acts outside the zone of reasonable disagreement. *Burden v. State*, 55 S.W.3d 608, 615 (Tex. Crim.App.2001). If the trial court's ruling is supported by the record and is correct under any theory of law applicable to the case, we shall uphold that ruling. *Brito Carrasco v. State*, 154 S.W.3d 127, 129 (Tex.Crim.App.2005).

Ishmael Perez testified to the following during direct examination:

Q. Did you know Mr. Garcia pretty well?

A. For a long time, yeah. We lived together for a while.

Q. Did you and Mr. Garcia share an apartment together for a while?

A. Yes, we did.

Q. Were you guys pretty good friends?

A. Yes.

Q. Did you know—did Edi have—was Edi married?

A. Yes.

Q. Do you know where his wife lives?

A. She lives in Mexico, Vera Cruz.

Q. And does Edi have any kids?

A. Two.

Q. Boys or girls?

[Defense counsel:] I'm going to object. That has no relevance, their age.

THE COURT: Overruled.

A. Boys.

Q. .... Are they grown or are they young?

A. They're young still.

Q. Okay. Do you know where Edi worked?

This entire testimony comprised approximately half a page in the fourteen-volume reporter's record.

To preserve an issue for appellate review regarding the alleged admission of erroneous evidence, a defendant must timely object to that evidence at trial. Tex.R.App. P. 33.1(a)(1); *Crivello v. State*, 4 S.W.3d 792, 801 (Tex.App.-Texarkana 1999, no pet.). The objection at issue followed testimony regarding the fact that Garcia had surviving children. Only thereafter did the witness testify Garcia's surviving children were "young" rather than "grown." But the witness never gave the children's ages. Nevertheless, Hatley failed to object to the testimony that Garcia's children were "young" once that testimony was given. Thus, either the complained-of evidence (regarding the specific ages of the children) was never introduced, or Hatley failed to object following the testimony that the children were "young." Regardless, nothing has been preserved for our review.

## V. Conclusion

The State's evidence sufficiently corroborated the testimony of Lewis, the accomplice witness. The evidence is factually sufficient to support Hatley's conviction for capital murder. The trial court did not err by withdrawing the negotiated plea agreement after Hatley confessed to breaching that agreement. And the record reveals no reversible error in the admission of testimony that the complainant's surviving children were "young."

Finding no error, we affirm the trial court's judgment.