NUMBER 13-03-742-CR 



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


CHRISTOPHER LOZANO, Appellant,


v.



THE STATE OF TEXAS, Appellee.

 


On appeal from the 275th District Court 

of Hidalgo County, Texas

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Rodriguez and Garza


Memorandum Opinion by Justice Rodriguez


 


 Christopher Lozano, Francisco Macias, and Megan Adams (the defendants)
were convicted for the murder of Jan Barnum, Adams's maternal grandmother. (1) 
The defendants were fifteen years old when the murder occurred and were tried
together as adults. A jury convicted all three defendants, sentencing Macias and
Adams to life in prison and Lozano to fifteen years' imprisonment. By four issues,
Lozano contends that (1) the evidence was legally and factually insufficient to
support his conviction, (2) the trial court erred by not charging the jury with the
lesser-included offense of manslaughter, (3) the trial court erred in trying him with
his co-defendants, and (4) the State improperly commented on his failure to testify. 
We affirm.

I. Background

A. Factual Background

 The defendants, along with J.R., Macias's girlfriend, had been planning to
run away to Louisiana by bus for several days. On March 5, 2003, Macias,
Adams, and Lozano were reported as runaways. That afternoon, they were found
trespassing in a vacant house near the apartment where Adams lived with Barnum. 
All three were detained at the police station until each was taken home by a
responsible adult. The defendants made plans during their detention to return to
the vacant house and to run away again.

 Once the defendants were at their respective homes, they snuck out,
proceeded to the vacant house, and ran into each other en route. According to the
statements given by the defendants to the police after the murder, they decided to
take Barnum's car shortly after joining up. Macias's statement and Lozano's
statement simply state that they were going to take the car. Their statements do
not specify whether the plan at that moment was to take Barnum's car to Louisiana
instead of traveling there by bus, or whether the plan was, as Adams recounted, to
take Barnum's car to Macias's girlfriend's house. In any event, a plan to take
Barnum's car was devised before the defendants reached her apartment.

 After the defendants met up, they walked to Barnum's apartment complex. 
Adams entered the apartment to find Barnum upset at her for leaving the
apartment. Barnum instructed Adams not to leave again. Macias and Lozano
waited by a storage shed near Barnum's apartment. At this point in the record, the
defendants' statements deviate from each other regarding the events just before
and during the strangulation. Moreover, Macias's in-court testimony varies in
significant respects from his written statement. The statements reconcile after the
defendants leave Barmun's apartment and attempt to flee the county.

1. Megan Adams's Written Statement

 According to Adams's statement, she entered the apartment, walked into
Barnum's bedroom, and took the car keys from her grandmother's purse. After
taking the keys, Adams sat in the living room and watched a television show. 
Once the show was over, she returned to her bedroom. Macias came to her
bedroom and told her to hurry up. Adams replied that she needed to wait until her
grandmother fell asleep, to which Macias stated, "To hell with that[,] just kill her."
Adams replied that she did not want to kill her grandmother and that they should
just wait.

 Barnum interrupted the conversation Adams was having with Macias. 
Adams told Barnum that she was just looking out the window and not talking to
anyone. A little later, Barnum asked Adams if she had the car keys. Adams
suggested they might be in the car and offered to check. Once outside, Lozano
approached Adams and told her "what [Macias] was planning to do." Adams
asked Lozano if he thought Macias was serious, and Lozano replied, "I think that
[Macias] is." But then Lozano also stated that he "did not think that Frank had the
guts to do it." When Barnum came out of her apartment, Adams quickly returned
to the car and pretended to look for the keys. According to Adams, Barnum did
not see Macias or Lozano. Adams walked into the apartment first, followed by
Barnum. Macias was already inside the apartment waiting in the restroom. 

 As Adams passed the restroom, she saw Macias in it and signaled for him to
do nothing. He just shook his head. When Barnum passed by the restroom,
Macias jumped out with a red, white, and blue ribbon that had been hanging in the
bathroom. Macias began strangling Barnum, and both fell to the floor. Adams ran
outside to find Lozano. When Lozano entered the apartment, he told Macias to
stop, but Macias did not. Adams gathered some stuff and sat on a chair and cried. 
Macias walked over to Adams and told her he was sorry. Adams asked Macias to
resuscitate Barnum, but Macias replied it was too late. Adams ordered Lozano to
get Barnum's purse, which he did. When Lozano brought Adams the purse, he told
Adams that Barnum was still breathing. The defendants then left the apartment
and went to J.R.'s house. They drove around, but did not make contact with J.R. 
Shortly thereafter, they were apprehended by police at a convenience store.

2. Christopher Lozano's Written Statement

 Lozano's statement does not mention whose idea it was to kill Barnum. 
Lozano stated that while waiting by the storage shed, Macias visited with Adams
three times over the course of the evening. After these encounters, Adams walked
out of the apartment and pretended to look for the keys in the car. At this point,
Macias walked back to Barnum's apartment. Shortly thereafter, Adams returned to
the apartment and had a verbal argument with Barnum. After the argument,
Adams again walked back outside the apartment and pretended to look for the
keys.

 While Adams was looking for the keys, Lozano approached her to speak with
her. Afterwards, he entered the apartment and witnessed Macias choking Barnum
with some kind of ribbon. Lozano exclaimed, "Dude quit . . . [it] and let[']s go."
Macias stopped, dragged Barnum by the ankles, put her in her bedroom, and closed
the door. Adams walked into the apartment during the choking, sat down, and
began to cry. Lozano hugged her, told her he was sorry, and then said that they
should leave.

 Lozano and the two co-defendants left the apartment. However, Lozano
returned twice. On the first occasion Lozano retrieved Adams' hamster and on the
second trip he retrieved a green blanket. During this time, Macias and Adams
made three trips into the house to retrieve items. The defendants fled in Barnum's
car and were detained shortly thereafter.

3. Francisco Macias's Written Statement

 According to Macias's statement, it was Adams's idea to kill Barnum. 
Macias and Lozano waited at the storage shed for a long time. Macias went to
Adams's window to see what the delay was in leaving. Adams told Macias that
she was still waiting for Barnum to fall asleep but that it was better if they killed
her. Adams explained to Macias that he could suffocate Barnum while she and
Lozano held Barnum down.

 When Macias returned to Lozano, he relayed Adams's plans. Lozano replied,
"just go for it." Adams then exited the apartment and told Lozano and Macias
about the plan to kill Barnum. At this point, the statement does not precisely
convey whether all three defendants or whether just Macias and Adams walked
around the apartment complex discussing how Macias was going to choke Barnum
while the other two held her down. Adams entered the apartment and returned a
short time later with a ribbon. Adams and Lozano then left. Macias entered
Barnum's apartment and proceeded to the restroom. Barnum came out of her
bedroom because Macias made a lot of noise. Adams then entered the apartment. 
Barnum and Adams discussed where the keys might be. Adams suggested that
Barnum check her bedroom again. When Barnum passed by the restroom, Macias
emerged and began strangling her.

 In the process of choking Barnum, both Barnum and Macias fell to the floor. 
Barnum was face down and Macias was on top of her, still choking her. Adams
walked in and started to cry in the living room. Lozano entered the apartment
shortly thereafter and was smiling. Lozano walked near Macias and Barnum, then
returned to Adams. Once Barnum's legs and arms stopped moving, Macias went
to Adams, hugged her, and said he was sorry. Macias then dragged Barnum's
body into her bedroom as Lozano held the door open. Adams asked Lozano to get
Barnum's purse and some cigarettes. After the defendants gathered their
belongings they left the apartment.

4. Francisco Macias's In-Court Testimony

 Macias's in-court testimony comports with his statement regarding Adams
initiating the murder plan that evening. While Macias and Lozano were waiting
across the street, Macias visited with Adams three times. On the first occasion,
Adams asked Macias to wait for Barnum to fall asleep. On the second occasion,
Adams told Macias that she was going to give Barnum nighttime cold medicine so
she would fall asleep. On the third occasion, Adams hatched the suffocation plan
as described in Macias's statement.

 Later in the evening, Adams came out of the apartment and called the two
other co-defendants over. From the stand, Macias could not recall if Lozano was
present during the conversation that ensued. In that conversation, Adams asked
Macias if he would go ahead with the plan. Macias replied, "I don't know." 
Adams returned to the apartment. Macias relayed to Lozano Adams's murder plans
and told him that he did not know whether he should do it.

 Macias's statement and in-court testimony differ significantly with regard to
Lozano's culpability. In his written statement, Macias claims that while relaying
Adams's plans, Lozano told him to "go for it." However, in court, Macias recanted
that portion of his statement. He testified that he included Lozano saying "go for
it" to implicate Lozano so that he would not "go down by [him]self." Macias also
recanted his statement's account of Lozano smiling upon entering the apartment
and seeing the strangulation.

 After conveying Adams's plan, Macias began walking with Lozano to a
friend's house, but Lozano claimed it was too late to go. Macias and Lozano
walked back to the apartment when Adams walked out of the apartment with a
ribbon that had a medallion on it. During cross examination, Macias could not
specify whether Lozano was near him when Adams handed him the ribbon. Macias
took off the medallion, threw it on the ground, and entered the house with Adams.

5. After the Strangulation

 The defendants' statements reconcile and the record continues with a clear
story after the defendants leave Barnum's apartment. After the murder, the
defendants went to a truck stop for a map of Louisiana. The truck stop they
visited did not have a Louisiana map. They then went to a convenience store to
purchase gas and a map. The convenience store clerk noticed the defendants
looked nervous and suspicious because they were teens out after the city's curfew,
wanted an atlas of Louisiana, and their car stalled at the gas pump. The clerk
relayed this information to Officer John Vargas, an off-duty police officer. He
recognized the teens from an encounter with them during their earlier runaway
attempt. Officer Vargas called dispatch to report three possible runaways and
requested back up.

 Officer Javier Gallegos was dispatched to the scene. He detained the teens,
put them in the back of his squad car, asked for their parents' contact information,
and attempted to phone their parents. No one answered at the telephone numbers
the defendants provided. While the teens were in the back of the squad car they
whispered to each other. He proceeded to drop them off at their respective homes. 
He first dropped off Macias. Then Lozano was dropped of at his aunt's house. 
Adams attempted to stay at Lozano's aunt's house, but Lozano's aunt refused to
accept her, stating that she was not staying with them.

 Throughout her detention, Adams insisted that Barnum was staying with a
friend and not at her house. After she attempted to stay with Lozano, she asked
Officer Gallegos to take her to Andres Narvaez's house. Narvaez was one of
Barnum's close friends and had known Adams for years. Adams called Narvaez
"Uncle Andy" even though no family relationship existed. She also asked Officer
Gallegos if she could speak to Narvaez alone. When Officer Gallegos arrived at
Narvaez's house, he left Adams in the car, knocked on the front door, and spoke to
Narvaez. Narvaez suggested going to Barnum's apartment. Officer Gallegos
returned to the squad car and waited for Narvaez to leave his house. Adams
insisted on talking to Narvaez, but a few minutes later Narvaez pulled suddenly out
of his driveway and drove to Barnum's apartment. Officer Gallegos testified
Adams was frustrated about not speaking to Narvaez.

 Upon arriving at Barnum's apartment, Adams and Narvaez spoke privately. 
Adams told Narvaez someone had broken into their apartment, strangled Barnum,
and attempted to strangle her. Narvaez relayed this information to Officer
Gallegos, who requested an ambulance, a supervisor, and backup. Officer Michael
Mata was the first to respond to Officer Gallegos's backup call. The two went
through the apartment in an attempt to find an intruder, but did not find one. 
Instead, they noticed the lights were on, no sign of forced entry, there was blood in
the hallway, and Barnum's body was laying on a bedroom floor. They secured the
scene and waited for more backup.

6. The Investigation

 Adams was immediately detained at the scene. Lozano and Macias were
retrieved shortly after the police discovered Barnum's body. All three were isolated
from each other at the police station, given their constitutional and statutory
warnings by police officers and a magistrate judge, and individually questioned.

 Lozano was questioned by Juvenile Investigator Miguel Hernandez, who
prepared Lozano's written statement. According to Investigator Hernandez, Lozano
appeared calm and showed no remorse or emotion while giving his statement. 
After the statement was printed, Lozano told Investigator Hernandez that Macias
gave him the ribbon while the teens were being detained in Officer Gallegos's
squad car at the convenience store. Macias testified that he tried handing the
ribbon to Adams, but that she refused. Lozano told Investigator Hernandez that he
put the ribbon in one of his cousin's rooms at her aunt's house. The police went to
Lozano's aunt's house and found the ribbon had been taken by the family dog.

 At trial, a neighbor testified that she saw the defendants walking around
Barnum's apartment around 10:30 p.m., the evening the murder occurred. Another
neighbor testified that Adams told her that she, Macias, and Lozano were going to
run away on the evening of the murder.

7. J.R.'s Testimony

 The State called J.R., Macias's girlfriend, to testify about a prior plot to kill
Barnum. According to J.R., several days before the murder J.R., Adams, Macias,
and Lozano were "hanging out." Adams was complaining about Barnum, and J.R.
suggested that Adams kill her. J.R. testified that everyone agreed to it, but on
cross-examination she could not specify who exactly agreed to the plan. The teens
asked Narvaez, Barnum's friend, to take them to the store. The boys and girls
parted ways in the store. The girls purchased roach poison spray, and the boys
bought cookies. After shopping, the teens rented a video and were returned to
Barnum's apartment.

 While watching the movie, J.R. and Adams went into the apartment's open
kitchen and sprayed the roach poison into a soda. They then threw the beverage in
the sink. Barnum told the boys to leave, but Adams insisted they stay. Barnum fell
asleep. And for reasons unknown to J.R., Adams snuck into Barnum's room, took
her car keys, and drove everyone to the store to steal nighttime cold medicine. 
When Adams returned, she poked holes in the pills and put the liquid in water. 
Adams woke Barnum and gave her the mixture. All this was apparently done so
that Macias and Lozano could spend the night without Barnum waking up and
kicking them out.

8. Forensic Evidence

 Crime scene investigators testified regarding evidence found at Barnum's
apartment. They found blood in the apartment's hallway that was analyzed and
determined to be Barnum's. The investigators also found roach poison spray and
empty nighttime cold medicine capsules in the apartment. Hair fibers removed
from Barnum's hand belonged to Adams. A medallion was recovered in the parking
lot of the apartment complex.

 Dr. Fulgencio Salinas, a pathologist, performed an autopsy. It revealed that
Barnum had lacerations around her neck and died of asphyxiation. However, Dr.
Salinas could not precisely determine how long it would take to kill an individual by
strangulation. He testified that the time it would take to die by strangulation would
vary by individual. Before death, a strangulation victim will pass-out within fifteen-to-thirty seconds from being strangled. Death could occur anytime between one-to-four minutes thereafter.

 Forensic evidence tying Lozano to the strangulation includes the ribbon and
Lozano's shoes and shoelace. The ribbon recovered at Lozano's aunt's house
contained Barnum's blood and Macias's DNA. In addition to the ribbon found at
Lozano's aunt's house, Barnum's blood was found on Lozano's shoe and a
shoelace.

B. Procedural Background

 A juvenile court waived exclusive jurisdiction and transferred the case to
district court. An indictment for Barnum's murder was filed against each of the
defendants. The State also filed a motion for joinder of defendants for trial, which
was opposed by Adams and Lozano. The trial court granted the State's joinder
motion, and a jury trial commenced.

 The jury was charged to find Lozano guilty of murder if it found beyond a
reasonable doubt (1) that Lozano intentionally or knowingly caused Barnum's
death; (2) that Macias or Adams, intentionally or knowingly caused Barnum's death
and that Lozano knew of their intent and acted with the intent to promote or assist
in the commission of the offense by soliciting, encouraging, directing, aiding, or
attempting to aid them by planning to kill Barnum, stating "go for it," smiling during
the commission of the offense, opening the victim's bedroom door, or taking the
victim's purse; or (3) that the three defendants entered into a conspiracy to commit
felony theft of Barnum's car and that Macias or Adams murdered Barnum in
furtherance of the conspiracy and such murder should have been anticipated as a
result of carrying out the conspiracy. See Tex. Penal Code Ann. §§ 7.01(a),
7.02(b), 19.02(b)(1) (Vernon 2003).

 Lozano did not object to the charge. No instruction was requested regarding
the accomplice-witness rule, and none was given. The jury convicted Lozano of
murder and sentenced him to fifteen years in prison. This appeal ensued.

II. Legal and Factual Sufficiency of the Evidence

 By his first issue, Lozano challenges the legal and factual sufficiency of the
evidence to support his conviction and contends that the State (1) failed to prove
that he had the specific intent to kill Barnum and (2) did not corroborate accomplice
testimony.


A. Standard of Review

 In conducting a legal sufficiency review, we view the evidence in the light
most favorable to the verdict. Jackson v. Virginia, 443 U.S. 307, 318-19 (1979);
Johnson v. State, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000). In doing so, we must
determine whether any rational trier of fact could have found the essential elements
of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 318-19; Johnson,
23 S.W.3d at 7.

When reviewing the factual sufficiency of the evidence, we view the
evidence in a neutral light. Watson v. State, 204 S.W.3d 404, 414 (Tex. Crim.
App. 2006). We will set aside a verdict only if: (1) the evidence supporting the
verdict, although legally sufficient, is nevertheless so weak as to be clearly wrong
and manifestly unjust, or (2) the verdict is against the great weight and
preponderance of the evidence. Id. at 414-15.

B. The Accomplice-Witness Rule

Pursuant to article 38.14 of the Texas Code of Criminal Procedure, "[a]
conviction cannot be had upon the testimony of an accomplice unless corroborated
by other evidence tending to connect the defendant with the offense committed;
and the corroboration is not sufficient if it merely shows the commission of the
offense." Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).

Although no precise rule has been formulated as to the amount of evidence
required to corroborate the testimony of an accomplice witness, we have held that
the tends-to-connect standard found in article 38.14 presents a low hurdle for the
State. Patterson v. State, 204 S.W.3d 852, 859 (Tex. App.-Corpus Christi 2006,
pet. denied) (en banc) (op. on reh'g) (citing Dowthitt v. State, 931 S.W.2d 244,
249 (Tex. Crim. App. 1996); Munoz v. State, 853 S.W.2d 558, 559 (Tex. Crim.
App. 1993)). There simply needs to be "other" evidence tending to connect the
defendant to the offense. Solomon v. State, 49 S.W.3d 356, 361 (Tex. Crim.
App. 2001) (citing Cathey v. State, 992 S.W.2d 460, 462-63 (Tex. Crim. App.
1999)).

The evidence used to corroborate accomplice testimony need not be
sufficient in itself to establish guilt beyond a reasonable doubt. Dowthitt, 931
S.W.2d at 249 (citing Gill v. State, 873 S.W.2d 45, 48 (Tex. Crim. App. 1994);
Munoz, 853 S.W.2d at 559; Cox v. State, 830 S.W.2d 609, 611 (Tex. Crim. App.
1992)); Patterson, 204 S.W.3d at 859. In addition, the corroborating evidence
need not directly link the defendant to the crime. Dowthitt, 931 S.W.2d at 249
(citing Gill, 873 S.W.2d at 48; Munoz, 853 S.W.2d at 559; Cox, 830 S.W.2d at
611); Patterson, 204 S.W.3d at 859. Furthermore, the corroborating evidence
need not prove all the elements of the alleged offense. Hatley v. State, 206
S.W.3d 710, 714 (Tex. App.-Texarkana 2006, no pet.) (citing Gill, 873 S.W.2d at
48; Munoz, 853 S.W.2d at 559; Reed v. State, 744 S.W.2d 112, 126 (Tex. Crim.
App. 1988); Jeffery v. State, 169 S.W.3d 439, 448 (Tex. App.-Texarkana 2005,
pet. ref'd)). While the accused's mere presence in the company of an accomplice
before, during, and after the commission of the offense is insufficient by itself to
corroborate accomplice testimony, evidence of such presence, coupled with other
suspicious circumstances may tend to connect the accused to the offense. 
Patterson, 204 S.W.3d at 860-61 (citing Dowthitt, 931 S.W.2d at 249; Gill, 873
S.W.2d at 49; Cox, 830 S.W.2d at 611). Even apparently insignificant
incriminating circumstances may sometimes afford satisfactory evidence of
corroboration. Id. (citing Dowthitt, 931 S.W.2d at 249; Munoz, 853 S.W.2d at
559).

In addressing Lozano's accomplice-witness argument we must (1) determine
whether the defendants' statements constitute testimony under the rule, and (2) 
determine whether Macias and Adams are accomplices.

1. Testimony Under the Accomplice-Witness Rule

 Statements taken by police officers in the course of interrogations are
testimonial under even a narrow standard. Crawford v. Washington, 541 U.S. 36,
50-52 (2004). In the instant case, the testimonial nature of the defendants'
statements is self-evident. After the murder, the defendants were detained, given
statutory and constitutional warnings, made statements to investigators, presented
to a municipal court judge, had their statements recited back to them by the judge,
and signed the statements in the judge's presence. Before the signature line the
statements read, "I certify that the facts contained herein are true and correct." In
short, the defendants' statements were obtained from law enforcement officials
and admitted into evidence by the State pursuant to the family code. Tex. Fam.
Code Ann. §§ 51.09 (Vernon 2002), 51.095 (Vernon Supp. 2006) (relating to the
statements of minors). The State introduced the statements as evidence at trial,
had the statements read aloud into the reporter's record, and adduced testimony
regarding each defendant's demeanor while giving his or her statement from the
interrogating investigator who took the statement.

 Any argument that the accomplice-witness rule is inapplicable because the
State presented only out-of-court statements made by the defendants and did not
present in-court accomplice testimony fails. See Bingham v. State, 913 S.W.2d
208, 213 (Tex. Crim. App. 1995) (op. on reh'g) (holding that out-of-court
statements made by accomplices need not be corroborated under the accomplice-witness rule). Even under the Bingham definition of testimony, which predates
Crawford, the defendants' statements constitute testimony adduced at trial. See
Bingham, 913 S.W.2d at 210 (providing that testimony for the purposes of article
38.14 is that which is "adduced in open court by live witnesses under oath"); see
also Badillo v. State, 963 S.W.2d 854, 860 (Tex. App.-San Antonio, 1998 pet.
ref'd) (holding that an accomplice's in-court testimony given during a habeas
corpus proceeding and presented as a statement in another's trial satisfied
Bingham's definition of testimony and triggered the accomplice-witness rule).



2. Macias and Adams were Accomplices

 Macias and Adams are accomplices as a matter of law in Barnum's murder. 
One who is (1) indicted for the same offense with which the defendant is charged,
or (2) indicted for a lesser-included offense based upon alleged participation in
commission of the greater offense, is an accomplice as a matter law. Ex parte
Zepeda, 819 S.W.2d 874, 876 (Tex. Crim. App. 1991). A review of the records in
Adams v. State, 180 S.W.3d 386 (Tex. App.--Corpus Christi 2005, no pet.), and
Macias v. State, No. 13-04-027-CR, 2007 Tex. App. LEXIS 6307 (Tex.
App.--Corpus Christi Aug. 9, 2007, no pet. h.) (not designated for publication),
reveals all three defendants were separately indicted for the murder of Barnum, but
tried together at the State's request. We have previously held that the sufficiency
of corroboration evidence is an absolute requirement and not subject to the rules of
procedural default. Patterson, 204 S.W.3d at 857. Therefore, we will consider
Lozano's challenges to the sufficiency of the evidence as though Macias and
Adams were accomplices.

C. Analysis

 Having determined that Adams and Macias are accomplices as a matter of
law, we must next determine whether the testimony of Adams and Macias was
corroborated by other evidence tending to connect Lozano to the offense. See Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 2005). If Adams's and Macias's
testimony as accomplices was corroborated by other evidence tending to connect
Lozano to the offense, then Lozano's conviction can stand on their testimony. See
id. If, however, their testimony was not corroborated by other evidence tending to
connect Lozano to the offense, then Adams's and Macias's testimony cannot be
relied on to support Lozano's conviction. See id.

 Here, the jury was charged under three theories of the offense of murder: 
(1) intentional murder, (2) the law of parties, and (3) murder in furtherance of a
conspiracy to commit another felony. See Tex. Penal Code Ann. §§ 7.01(a),
7.02(b), 19.02(b)(1) (Vernon 2003). We will begin our analysis with the third-charged theory of murder--that Lozano was responsible for Barnum's murder
because she was murdered in furtherance of Lozano, Adams, and Macias's
conspiracy to steal or to use, without authorization, Barnum's car. To prove that
Lozano was guilty of murder under this theory, the State had to prove that (1)
Lozano, Adams, and Macias conspired to commit theft or to engage in the
unauthorized use of Barnum's car, (2) Adams or Macias murdered Barnum, (3)
Barnum's murder was committed in furtherance of the conspiracy to steal or to use
Barnum's car without authorization, and (4) Barnum's murder should have been
anticipated as a result of carrying out the conspiracy. See id. §§ 7.02(b),
19.02(b), 31.07 (Vernon 2003).

 We will first review "other" evidence, that is, non-accomplice evidence
related to the third charge, to determine whether it tends to connect Lozano to the
offense. See Tex. Code Crim. Proc. Ann. § 38.14 (Vernon 2005); see also
Solomon, 49 S.W.3d at 361 (citing Cathey, 992 S.W.2d at 462-63). Lozano
admitted in his written statement that when he and Macias met Adams, Macias
asked Adams if they could take Barnum's car, and that Adams said, "we could, but
we had to wait for [Barnum] to fall asleep." Lozano further admitted that he "got
frustrated" waiting for over an hour outside Barnum's apartment for Barnum to fall
asleep. He then acknowledged walking into Barnum's apartment and observing
Macias choking Barnum with a ribbon. At trial, the State introduced into evidence
Lozano's left tennis shoe which contained Barnum's DNA. The State also
introduced into evidence a ribbon containing both Barnum's and Macias's DNA,
which police found at Lozano's aunt's house. We conclude that this evidence
tends to connect Lozano to the offense, and, therefore, satisfies the corroboration
requirement of article 38.14. See Tex. Code Crim. Proc. Ann. art. 38.14 (Vernon
2005). As a result, we further conclude that the jury could consider Adams's and
Macias's accomplice testimony in finding Lozano guilty of the offense of murder. 
Accordingly, we will now review the legal and factual sufficiency of the evidence,
including the accomplice testimony, relating to the third charge.

 As to the first element, that is, the conspiracy element, of the charge, the
record establishes that Lozano, Adams, and Macias were planning to run away and
had planned to meet each other the evening of March 5, 2003. Lozano's
statement shows that after the three met each other on March 5th, Macias asked
Adams if they could take Barnum's car, and that Adams said, "we could, but we
had to wait for [Barnum] to fall asleep." Macias's statement demonstrates that
both he and Lozano asked Adams if they could take Barnum's car, to which Adams
replied, "Yes." The record then shows that the three defendants walked to
Barnum's apartment and that Adams went into Barnum's apartment while Lozano
and Macias waited outside the apartment for Barnum to fall asleep. The record
establishes that while inside the apartment, Adams took Barnum's car keys from
Barnum's purse. The record also reveals that after Barnum's murder, the three
defendants fled the scene in Barnum's car.

 With respect to the second and third elements, that is that the commission
of murder be in furtherance of the conspiracy to take Barnum's car, the record
establishes that Lozano "got frustrated" waiting for Barnum to fall asleep so that
they could take her car as they had planned. Adams's statement shows that while
Lozano and Macias were waiting outside of Barnum's apartment for Adams, Macias
told Adams to hurry, that Adams told Macias she "needed to wait for [Barnum] to
fall asleep," and that Macias replied, "to hell with that[,] just kill her." Macias's
statement demonstrates that he and Lozano had "waited for a long while," that
Adams told him she was waiting for Barnum to go to sleep, "but that it was better
if we killed her." In his statement, Macias admitted to choking Barnum with a
ribbon. Lozano's statement shows that he waited by the shed and that he later
observed Macias choking Barnum with a ribbon. At trial, Macias admitted to
choking Barnum. The record reveals that Barnum died of asphyxiation.

 As to the final element, namely that Lozano should have anticipated
Barnum's murder, the record establishes that on February 28, 2003, Lozano,
Adams, Macias, and J.R., Macias's girlfriend, were at Barnum's apartment. J.R.
testified that Barnum and Adams had gotten into an argument after Barnum asked
Lozano and Macias to leave and that Adams had told Barnum they would not leave. 
J.R. also testified that Barnum then went to her room. J.R. stated that Adams
said, "she hated [Barnum] and [Adams] wanted her to die or she wanted - she
wishes [Barnum] was dead, hated her." J.R. testified that, "we said why not kill
her," but she could not recall who had suggested that Barnum be killed; however,
she did state that all four of them were present when the suggestion was made.

 J.R. further testified that a plan to kill Barnum with cockroach poison was
devised while she, Lozano, Adams, and Macias were in the living room of Barnum's
apartment. However, J.R. testified that she could not remember who came up
with the plan. J.R. stated that Adams then called "Uncle Andy," Barnum's friend,
so that he could take them to the store to buy cockroach poison. J.R., Lozano,
Adams, and Macias went with Uncle Andy to the store. According to J.R.'s
testimony, J.R. and Adams located the cockroach poison while Lozano and Macias
looked for cookies; Uncle Andy paid for the cockroach poison. J.R. testified that
when the four returned to Barnum's apartment, Adams sprayed cockroach poison
into a soda can but then threw away the can.

 Thus, viewing the evidence in the light most favorable to the verdict, we
conclude that a rational jury could have found the essential elements of the third-charged offense beyond a reasonable doubt. See Jackson, 443 U.S. at 318-19;
Johnson, 23 S.W.3d at 7. Therefore, we conclude that the evidence is legally
sufficient to support Lozano's conviction for murder.

 Furthermore, viewing the evidence in a neutral light, we conclude that the
jury's verdict is not so weak as to be clearly wrong and manifestly unjust and that
the verdict is not against the great weight and preponderance of the evidence. See
Watson, 204 S.W.3d at 414-15. Therefore, we conclude that the evidence is
factually sufficient to support Lozano's conviction for murder.

Because the third-charged offense does not require intent on the part of
Lozano to murder Barnum, we need not address Lozano's sub-issue related to
whether he had the specific intent to murder Barnum. See Tex. R. App. P. 47.1. 
Furthermore, having concluded that the evidence is legally and factually sufficient
to support Lozano's conviction under the third-charged offense, we need not
address the sufficiency of the evidence to support his conviction under the first- or
second-charged offenses. See id.; see also Hooper v. State, 214 S.W.3d 9, 14
(Tex. Crim. App. 2007) (providing that where the indictment and the charge
authorize the jury to convict on more than one legal theory the verdict will be
upheld if the evidence is sufficient on any of the theories possible).

III. Lesser-Included Offense

By his second issue, Lozano asserts that the trial court erred in failing to
include "Appellants [sic] requested instructions in the Courts [sic] charge for the
lesser offense of Manslaughter." See Tex. Code Crim. Proc. Ann. arts. 37.08,
37.09 (Vernon 2006). Specifically, Lozano contends that "[a]t the charge
conference the Defense requested that the Court include a lesser included charge in
the Courts [sic] Charge," and the trial court denied the request. We conclude,
however, that Lozano failed to preserve this issue for our review.

It is well settled that an appellant may not complain for the first time on
appeal about the omission of an unrequested instruction on a lesser-included
offense. See Thomas v. State, 701 S.W.2d 653, 656 (Tex. Crim. App. 1985); see
also Paz v. State, 44 S.W.3d 98, 100-101 (Tex. App.--Houston [14th Dist.] 2001,
pet. dism'd); Morales v. State, 767 S.W.2d 207, 209-210 (Tex. App.--San
Antonio 1989, writ ref'd). To preserve this issue for appeal, an appellant must
either request such an instruction or object to its omission at trial. See Kinnamon
v. State, 791 S.W.2d 84, 96 (Tex. Crim. App. 1990), overruled on other grounds
by Cook v. State, 884 S.W.2d 485, 491 (Tex. Crim. App. 1994); see also Tex.
Code Crim. Proc. Ann. art. 36.14 (Vernon 2007).

Here, Lozano refers this Court to a portion of the record wherein he asserts
that he requested a charge on the lesser-included offense of manslaughter. 
However, in the portion of the record referenced by Lozano, Lozano moved for a
directed verdict after the State rested; he did not seek a charge on the lesser-included offense of manslaughter in that portion of the record. Furthermore,
although Adams and Macias requested a charge on the lesser-included offense of
manslaughter at the charge conference, Lozano made no such request. Moreover,
when asked by the trial court at the conclusion of the charge conference if he had
any objection to the charge, counsel for Lozano responded, "[w]e have no
objections at this time, Your Honor."

Because Lozano failed to request an instruction on the lesser-included
offense of manslaughter or to object to its omission from the charge at trial, Lozano
failed to preserve this issue for our review. See Kinnamon, 791 S.W.2d at 96; see
also Tex. Code Crim. Proc. Ann. art. 36.14 (Vernon 2007). Accordingly, we
overrule Lozano's second issue.

IV. Severance

By his third issue, Lozano asserts that "the Trial Court erred in trying the
Appellant with his Co-Defendants, over objection." Lozano bases his assertion on
the premise that a severance was mandatory because it was shown that a joint
trial would be prejudicial to him. However, because Lozano did not move for a
severance, we conclude that Lozano failed to preserve this issue for our review.

Article 36.09 of the Texas Code of Criminal Procedure states the following:

Two or more defendants who are jointly or separately indicted or
complained against for the same offense or any offense growing out
of the same transaction may be, in the discretion of the court, tried
jointly or separately as to one or more defendants; provided that in
any event either defendant may testify for the other or on behalf of
the state; and provided further, that in cases in which, upon timely
motion to sever, and evidence introduced thereon, it is made known to
the court that there is a previous admissible conviction against one
defendant or that a joint trial would be prejudicial to any defendant,
the court shall order a severance as to the defendant whose joint trial
would prejudice the other defendant or defendants.


Tex. Code Crim. Proc. Ann. art. 36.09 (Vernon 2007). In order to preserve a
complaint that the trial court abused its discretion in failing to order a severance, a
defendant must make a timely motion to sever and introduce evidence thereon. 
Gibbons v. State, 794 S.W.2d 887, 891 (Tex. App.--Tyler 1990, no pet.) (citing
Tex. Code Crim. Proc. Ann. art. 36.09).

 Here, the State filed a motion for joinder, requesting that the trial court join
the cases of the three defendants. Adams moved for a severance on July 8, 2003
at a pretrial hearing on the following bases: that there were inconsistent defenses,
that there were varying degrees of guilt, that the co-defendants were in a position
adverse to Adams, that a joint trial would not provide Adams with "affective [sic]
assistance of due process of law as guaranteed by the United States Constitution
Amendment Number 5 and Number 14," and that a joint trial would be in violation
of article I, section 10 of the Texas Constitution. At the same hearing, counsel for
Lozano stated the following:

Judge, at this particular time our concern with the joinder of
these cases is based somewhat on speculation at this point, being that
we're not really sure where we're going to end up. I don't know if
there is any actual prejudicial effects that might - that I can think of at
this time - I'm citing a case . . . where it states that there are certain
conditions that must be met in order where a severance would be
ordered or would be appropriate. And it's also the situation where we
may need one or both of the co-Defendants in this case who could
possibly at some point testify on behalf of my client, and some of that
testimony could possibly be exculpatory in nature. . . . So my
concern, you know, I echo some of Mr. Reyes's [counsel for Adams]
concerns. But again, at this point it is based more on speculation than
actual facts because I don't know what the other two Defendants
intend to do during the course of trial. So, to that extent we would
oppose [joinder].


 If the Court was to rule in favor of joining these cases, Your
Honor, for the record, we are reserving our right to file a motion to
sever in the future pursuant to Section - Article 36.09 of the Code of
Criminal Procedure that says that a motion to sever is . . . considered
timely at any point when we discover some evidence or any additional
information that comes to light that might actually put the whole
prejudicial effect back in - you know, bring it back into the picture. 
So, again, if the Court does rule in that favor, I am advising the Court
that we perhaps might even be pursuing that somewhere down the
road if the need ever arose.


Thus, although counsel for Lozano "echo[ed] some of Mr. Reyes's [counsel for
Adams] concerns," and counsel for Lozano indicated to the trial court that he was
"reserving [Lozano's] right to file a motion to sever in the future," Lozano did not
file a motion to sever. The trial court subsequently granted the State's motion for
joinder. 

 On August 19, 2003, the trial court held another pretrial hearing, and Adams
re-urged her motion for severance on two additional grounds: that joinder would
result in a reduction of peremptory strikes for Adams, and that the introduction by
the State of statements or confessions of co-defendants would "deny [Adams the]
right to cross examine witnesses, to confront them as guaranteed by the Sixth
Amendment of the United States Constitution and Article 1, section 10 of the
Texas Constitution." After counsel for Adams re-urged the motion for severance,
the trial court stated the following:

Yes, sir. And this case that you presented to the court through my
staff, Mr. Reyes, Bass versus State, I gave a copy to Mr. Garza,
Honorable Roy Garza [counsel for Macias], Honorable Luis Singleterry
[counsel for Lozano], and Honorable Murray Moore [prosecutor]. And I
believe you all have had an opportunity to read the case. Do you join
in this motion?


Counsel for Macias responded as follows: "Your Honor, from the outset of this
trial I have never - we never requested a severance. We have no problem with a
joinder, Judge." Counsel for Lozano then stated the following: "Your Honor, at this
time we follow in his argument, Your Honor, make the same argument." (2) 
However, it is unclear from this statement whether Lozano merely intended to
agree with the arguments made by Adams or whether Lozano intended to join in
Adams's motion to sever; furthermore, Lozano does not urge this Court to construe
his counsel's statement as an indication that he intended to join in Adams's motion
to sever. Moreover, Lozano does not dispute on appeal that he did not file a
motion to sever. Because the record does not establish that Lozano filed a motion
to sever, we conclude that Lozano did not preserve this issue for our review. See
Gibbons, 794 S.W.2d at 891 (citing Tex. Code Crim. Proc. Ann. art. 36.09). 
Lozano's third issue is overruled.

V. Comment on Appellant's Failure to Testify 

By his fourth issue, Lozano contends that the trial court erred in permitting
the State to comment on his failure to testify on two occasions during the
punishment phase of trial. We conclude, however, that appellant also failed to
preserve this issue for our review.

"The rule against commenting on a defendant's invocation of [his] right to
remain silent is well known." Griffin v. State, 181 S.W.3d 818, 823 (Tex.
App.--Houston [14th Dist.] 2005, pet. ref'd) (citing Bustamante v. State, 48
S.W.3d 761, 764 (Tex. Crim. App. 2001)); see U.S. Const. amend. V; see also
Tex. Code Crim. Proc. Ann. art. 38.08 (Vernon 2005). "Neither the court nor the
prosecutor may comment on that invocation." Griffin, 181 S.W.3d at 823 (citing
Bustamante, 48 S.W.3d at 764). Nevertheless, a defendant forfeits his right to
complain on appeal about a prosecutor's comment regarding his failure to testify if
the defendant fails to make a timely, specific objection to the prosecutor's
comment at trial. See Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App.
1996) (en banc); Berrett v. State, 152 S.W.3d 600, 603 (Tex. App.--Houston [1st
Dist.] 2004, pet. ref'd) (citing Johnson v. State, 629 S.W.2d 953, 954 (Tex. Crim.
App. 1982)); see also Tex. R. App. P. 33.1.

Because Lozano failed to object to the prosecutor's purported comments
regarding his failure to testify at trial, he failed to preserve this issue for our review.
 See Cockrell, 933 S.W.2d at 89; Berrett, 152 S.W.3d at 603 (citing Johnson, 629
S.W.2d at 954); see also Tex. R. App. P. 33.1. Therefore, we overrule Lozano's
fourth issue. 

VI. Conclusion

 Accordingly, we affirm the judgment of the trial court.


 

 NELDA V. RODRIGUEZ

 Justice

 

Dissenting Memorandum Opinion 

by Chief Justice Valdez.


Do not publish. 

Tex. R. App. P. 47.2(b).


Memorandum Opinion delivered and 

filed this 30th day of August, 2007.
1. Adams's conviction was affirmed by this Court on December 8, 2005. See Adams v. State,
180 S.W.3d 386, 418 (Tex. App.--Corpus Christi 2005, no pet.). Macias's conviction was also
affirmed by this Court on August 9, 2007. See Macias v. State, No. 13-04-027-CR, 2007 Tex. App.
LEXIS 6307, at *12 (Tex. App.--Corpus Christi Aug. 9, 2007, no pet. h.) (not designated for
publication).
2. After hearing additional arguments by counsel for Adams and the State, the trial court denied
Adams's motion for severance. In Adams, we concluded that the trial court acted within its discretion
in denying Adams's motion to sever. See Adams, 180 S.W.3d at 403.