

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-16-00034-CR

JASON THAD PAYNE, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 402nd District Court
Wood County, Texas
Trial Court No. 20,529-2008

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

Jason Thad Payne was convicted by a jury of capital murder and sentenced to confinement in prison for life. On appeal, Payne contends (1) the evidence was legally insufficient to sustain his conviction, (2) the trial court abused its discretion when it admitted evidence in violation of the provisions of Rule 404(a) of the Texas Rules of Evidence, and (3) the trial court abused its discretion when it admitted a recording of a telephone conversation between Payne and his mother. For the reasons below, we affirm the trial court's judgment.

## I. Evidence at Trial

### A. The Offense and the Initial Investigation

Payne, along with his wife, Nichole, and their two young children, Riley and Joseph,[1] moved to their new home in Quitman, Texas, just seven months before the alleged offense occurred. Nichole's fifteen-year-old son from a previous marriage, Adam, also moved into the Quitman home. On the morning of December 11, 2007, Payne contacted 9-1-1 and informed the operator that his wife and son had been shot and that he needed assistance. Lieutenant Miles Tucker of the Wood County Sheriff's Office[2] arrived at the residence and observed Payne in the driveway, carrying his two-year-old daughter, Riley. After speaking briefly to Payne, Tucker proceeded to enter the residence, but noticed that Payne was following him inside the home. Tucker advised Payne to remain where he was, and then asked another officer to stay with Payne.

---

[1]We refer to the children by fictitious names in order to protect their privacy. *See* TEX. FAM. CODE ANN. § 109.002(D) (West 2014).

[2]At the time of trial, Tucker was chief deputy of the sheriff's office.

Upon entering the residence,[3] Tucker quickly located Nichole's body lying in a bed in the downstairs bedroom. Her body was warm to the touch. Tucker observed that Nichole "had massive damage to the back of her head." Tucker stated that when he initially entered Nichole's bedroom, there existed a strong odor of gunpowder. The cause of Nichole's death was later determined to be a gunshot wound to the head, and the manner of her death was homicide.

Not long after Tucker found Nichole's body, other officers on the scene located Adam's body in the garage of the residence. Tucker was notified and immediately went to the garage. Upon entering the garage, Tucker saw Adam's body, with what appeared to be a bullet wound in the facial area "on the mouth, kind of to the side." Tucker proceeded to touch Adam and found that his body was cold and had begun "to be stiff with rigor." Adam's fully-clothed body[4] was lying supine on the bed,[5] his feet were touching the floor, and there was a .30-.30 rifle resting between his legs. Tucker testified that the rifle was "a lever-action weapon," containing a safety feature. He also stated that unlike his entry into Nichole's room, he did not smell the odor of gunpowder when he entered the garage. Adam's autopsy revealed that he died from a gunshot wound. The manner of Adam's death was considered undetermined.

Sergeant William Burge, who was also at the residence that day, testified that as soon as he walked through the front door of the residence, he noticed the odor of gunpowder in the air.

---

[3]There was no evidence of a forced entry into the home.

[4]In order to determine if Nichole's blood was on Adam's clothing, Tucker sent Adam's clothes to the Southwest Institute of Forensic Sciences (S.W.I.F.S.) laboratory to be tested. The only blood found on Adam's clothing was his own. There were also clothing items found in the washing machine, which were collected and logged as evidence.

[5]The garage had been converted into a bedroom for Adam.

3

Burge stated that while taking photographs of the scene, he had the opportunity to view Nichole's body. He stated that "[Nichole's] brain [had been] excavated from her skull on the floor" and that it still appeared to be warm. Burge explained that when he finished taking photographs of the interior of the residence, he went outside and approached Payne's truck. Inside the vehicle, he observed a washcloth containing what he believed to be blood.[6] Burge stated that the blood appeared to be "fresh" and was "bright red" in color.

Lesia Cockrell, a paramedic for East Texas Medical Center, EMS, was dispatched to the scene the morning of the incident. Immediately after her arrival, Cockrell entered the home and was directed to Nichole's bedroom. Cockrell testified that she smelled the odor of gunpowder and that she knew that particular odor because she frequently shot firearms. Cockrell touched Nichole's uncovered leg to check for body temperature, which she stated was warm, "[a]s what you would expect for anybody standing in the room." Realizing there was nothing she could do to assist Nichole, Cockrell was escorted "through the house to the opposite side to where [she] found a young male." Cockrell stated that Adam was laying supine across the bed and that he was "cold and stiff." Cockrell eventually checked Adam's body for lividity and determined that "[h]e had dependent lividity[7] on his back side of his back. The back side of both arms, and his lower extremities that were hanging off the bed."

---

[6]Documentary evidence was presented showing that Nichole had gone to the emergency room on October 19, 2007, with a fishing lure in her neck. Medical personnel extracted the lure and closed the wound with three sutures. Nichole was released from the hospital the same day. Payne contends the blood found on the washrag had gotten there as a result of Nichole's fishing accident.

[7]Cockrell explained that "lividity" was "when the blood begins to pool after death and it will settle to the lowest part of the body." Cockrell testified that she observed no lividity in Nichole's body.

4

Leah Courtney, an emergency medical technician, also responded to the scene that morning. Courtney testified that Nichole's body was "really warm," and she felt like "she had just died." Courtney stated that Nichole's skin was normal in color and that had she not seen Nichole's injuries, "you wouldn't know that she was -- had been dead." Courtney was also taken to the garage where Adam was located. She testified that Adam had a gunshot wound to his upper lip, that "[h]e was very cold" and "kind of already blue." Courtney stated that Adam had begun to "get[ ] stiff in through his jaw right in through his shoulder area" and that she observed lividity in his fingers. Courtney admitted that she had not taken Adam's or Nichole's body temperature; however, she opined that Adam died prior to Nichole and that she believed Adam had been dead much longer than Nichole had been. Courtney testified that she saw the rag that had been taken from Payne's truck, and she believed the blood on the rag was fresh blood.

Misty Burns, a Wood County police officer, testified that when she arrived, she saw multiple officers, as well as Payne and Riley. She immediately met with Tucker, who told her to go stand by Payne and Riley. Burns stated that when she began walking toward them, Payne began walking toward the truck. Burns instructed Payne to return and to remain with her.

**B.      Forensic Evidence**

Whether Adam's death was a suicide or a homicide was a significant issue at trial. Testifying on behalf of the State, Dr. Leon Kelly, a forensic pathologist, explained why he believed Adam's autopsy resulted in an undetermined manner of death:

> In this case -- you know, gunshot wounds to the head are very common modes of suicide. In this particular case, it's an atypical location the top of the lip which isn't a typical place for individuals to shoot themselves. The classic places being either the side of the head or in the mouth or under the chin. Then the range

5

of fire. The overwhelming majority of suicides are contact gunshot wounds, meaning the person has the weapon. They put the weapon right up to their head or chest, and they pull the trigger.

So when you do see a case where you have an atypical location as well as a range of fire that's anything but contact, in this case it's intermediate, because we know the weapon has to be some distance away to get that stippling, it gives you pause, and it usually buys you an undetermined manner of death, because this type of picture can be accounted for by both a self[-]inflicted gunshot wound or a gunshot wound inflicted by another individual.

Kelly testified that within a period of nine years, he had performed approximately 300 autopsies on individuals with self-inflicted gunshot wounds. Kelly stated, "I've personally never directly observed or done an autopsy on someone who has used a long-barreled weapon and also had intermediate range of fire." Kelly described Adam's wound as entering on the upper left lip and exiting on the right back of the head. He stated it was a "very, very slight" left to right and "[m]ostly upward and front to back." Kelly believed that at the time Adam was shot, he was leaning away from the weapon. Kelly opined that Adam had been shot prior to the time Payne and the two younger children left the home.

Tom Bevel, the president of Bevel, Gardner & Associates, which is a forensic education and consulting firm, testified that he was adept at doing bloodstain spatter analysis and he explained what he believed was involved during such an analysis.[8] Bevel stated that he was board

---

[8]Bevel stated,

> Bloodstain pattern analysis is specifically geared towards identifying blood as it is found, breaking it down into typically one of two categories. One would be passive. The other would be dynamic.
>
> Under each one of those categories, there is multiple different categories that based upon the -- a taxology process, which is physical descriptor of how we're seeing the blood to identify how it might have gotten there. Also, considering the facts of the case.
>
> . . . .

certified in crime scene analysis reconstruction and referred to the method he used as "holistic" crime reconstruction.[9] During his investigation, Bevel noted that in Nichole's bedroom, there was a tremendous amount of forward spatter and that because of this, there would be very minimal amount of back spatter, that is, blood found on the weapon or on the person who discharged the weapon.

In addressing blood evidence related to Adam's death, Bevel stated the blood found on Adam's hand did not get there as a result of Adam holding the barrel at the time of the gunshot. Bevel explained,

> And if you bring him all the way back up and now start looking at the blood that is on the hand, again, as I mentioned previously, it's in 11 different locations on the hand. And if you look at those locations, place your hand around the barrel and look at if [sic] from the end-of-muzzle distance, for example of 10 inches, you can tell where the blood should be if the hand is holding the barrel.
>
> And, it's in the wrong places to have gotten there with the hand holding the barrel.

---

So it's taking all of the information that would be germane to that specific question on the bloodstains to address how did that get there.

[9]Bevel explained, in part:

> You take all of the information that is available, obviously, you have to study that. You end up identifying questions that would assist in understanding the events, the consequences of those events, and you -- anything isn't possible actually within the world, so you don't consider something, you know, of the fifth dimension. We consider the limited universe of our crime scene, and we identify viable ways that something could have occurred that is consistent with -- that could have occurred within this crime scene.
>
> Then we pull in the physical evidence and that would -- even though I am not a forensic pathologist and don't purport to be. But I should have the ability to pick up the other experts' reports such as the forensic pathologist and understand what wounds he is identifying, he or she, and how that might relate to the crime scene we're studying. Again, that is part of the information looking at it in a holistic view.

Bevel also identified the end of the muzzle distance from Adam's wound itself, by examining the distribution of stippling.[10] Bevel stated that he shot the weapon from the crime scene using the same type of ammunition that had been identified in the reports that he had received from law enforcement agencies. According to Bevel, the weapon used was between eight and twelve[11] inches from Adam when it had been fired. Bevel explained he attempted to determine "[i]f [Adam's] hand is on the barrel at 10 inches with the end of the muzzle away from the wound, can an individual from armpit to outstretched finger, 26 inches, can they manipulate and discharge the firearm. And also keep the correct trajectory." Bevel stated that he was unable to shoot the weapon under those circumstances and that he was unable to find any other person with the ability to do so. In addition, Bevel explained the safety feature on the rifle, that is, that while Adam was pulling the trigger, he would have also had to deactivate the safety. Bevel believed that based on the bullet's trajectory, Adam would have been leaning back and away from the rifle at the time the weapon discharged. In relation to the location of the rifle after it had been fired, Bevel stated he believed the recoil would have propelled the rifle away from Adam's body as opposed to positioning itself between Adam's legs.

---

[10]Bevel informed the jury that "[s]tippling is burned or partially burned gunpowder that is propelled on the discharge of the firearm out of the barrel." He explained that the closer the target is, there would be less dispersal of stippling and that "[t]he farther back up to a point, the more coverage that you have or dispersal of the stippling."

[11]Bevel testified that he identified the range to be approximately ten inches, but taking into consideration the typical margin of error, which is plus or minus two inches, the approximated range would have been between eight and twelve inches.

Bevel explained the difference between a contact wound and a noncontact wound[12] and explained that Adam's wound was not a contact wound and that Nichole's wound was a contact or near contact wound. Bevel testified that he had been to approximately a thousand scenes involving gunshot wounds and that in his experience, he could not identify a case where a person had committed suicide with a "long gun and not a contact [wound]." Based on all of the evidence Bevel had been furnished[13] and the evidence he gained from his reenactment of Adam's death, Bevel informed the jury "[t]hat this [was] not a homicide suicide. It [was] a double homicide."

Richard Ernest, the State's firearm specialist, testified that he had been contacted by Bevel, who asked him to "determine a muzzle to target distance, from the end of the barrel to the face of [Adam], which was the gunshot entry hole." Using a .30-.30 lever-action rifle, Ernest also concluded that the muzzle-to-target distance had been twelve inches, plus or minus two inches. On cross-examination, Ernest stated, "Now, what you're suggesting is, this young man took this particular rifle, held it at a distance and then somehow manipulated the trigger with his feet so he could shoot himself accurately. That makes no sense . . . ."

Noel Martin, a Smith County deputy sheriff, testified on Payne's behalf. Martin stated that he had the opportunity to observe the scene the evening of the incident, following the removal of Nichole's and Adam's bodies. Martin explained to the jury that he had been given photographs of

---

[12]Bevel stated, "A contact wound would be end of muzzle making contact with whatever part of the body that the bullet would be entering. As an example if I was using my finger, a contact would be touching my actual skin wherever that bullet would be entering. Noncontact would be moving away from the skin."

[13]Bevel reviewed the following: the transcripts and audio/video recording of Payne's interview the day of the event, a hand-drawn sketch of the first floor of the Payne's home, Adam's autopsy report, Nichole's autopsy report, a list of physical evidence and a supplement to the original, and the crime scene photographs.

Adam's body as it was found at the scene, and that he found three things of extreme importance: (1) the position of the rifle, (2) the state of Adam's clothing, and (3) the bloodstains. Regarding the position of the rifle, Martin stated that "having worked many suicides and homicides in the past, firearms end up in all kinds of ridiculous positions" and that he did not see any evidence to indicate the rifle had been "planted" by anyone. Martin testified there were no signs of staging and that the rifle was simply in its final resting place after it had been fired. Martin observed no signs of struggle or any type of extreme movement at the time of the shooting.

In relation to the bloodstains, Martin testified that the photograph of the back spatter on Adam's hand "indicate[d] that he was holding, or it's consistent with being near the blood source at the time of blood shed." Martin explained he had worked hundreds of suicides, homicides, and accidental deaths that were the result of gunshot wounds. He stated that in his experience, he had seen self-inflicted gunshot wounds that were not contact or near contact wounds, but he conceded they were in the minority. Martin testified that because Adam's blood was found on the exterior portion of the muzzle of the rifle, it would be consistent with Adam having shot Nichole and then turning the gun on himself. As further evidence of this, Martin believed there was a "void" on the barrel of the rifle where Adam had been holding the weapon. Martin testified the blood pattern indicated that when Adam shot himself, he was seated upright on his bed at a forty-five degree angle and that blood found on Adam's thigh had originated from above the thigh at the time the gun was discharged.

According to Martin, if another individual had attempted to shoot Adam, it would have been a natural response for him to raise his hands in order to defend himself, thus leaving stippling

10

or gunshot residue on Adam's hands. Adam's hands were free of either stippling or gunshot residue. Martin also pointed out there was also no evidence of gunshot residue on Payne's hands nor was there any physical evidence that Payne was present at the time the rifle was discharged. In Martin's opinion, Adam would have been able to shoot himself from a muzzle range as close as four inches. Martin also believed that the location of the entry wound found on Adam suggested that the rifle fired prematurely. In Martin's opinion, Adam shot Nichole and then turned the gun on himself. According to Martin, the individuals at the scene were incorrect about the onset of rigor mortis in Adam's body.

Martin was asked about testing that had been performed on the bloody washcloth found in Payne's truck. The testing revealed that the blood on the washcloth was Nichole's and that it also contained gunpowder residue. According to Martin, gunpowder residue was easily transferred, and he agreed that "[i]f weapons had been carried in the back of [Payne's] pickup truck, . . . it [was] possible that it would have been transferred off of the guns on to the carpet and off of the carpet and whatever on to the wash rag[.]" Martin also agreed that if Burge handled the rifle and then went to recover the rag from the truck without changing his gloves, it was possible that the gunshot residue could have been transferred onto the washcloth at that point. As to a description of the blood on the washrag, Martin stated that the stain was a "saturation stain," which resulted from holding the rag on a small bleeding wound. Martin stated that the blood on the washrag appeared to have gotten there recently, but that it was not absurd to believe the blood had been transferred to the rag two months earlier by virtue of a fishing accident in which Nichole was involved.

11

Dr. Amy Gruszecki, a forensic pathologist, testified on behalf of the defense. Gruszecki stated that following her review of Adam's and Nichole's autopsy reports, she believed that it was "very suggestive" that Nichole died prior to Adam. Gruszecki believed that a finding of suicide would be consistent with her review of Adam's autopsy report. Gruszecki was asked to examine a photograph of Nichole's fishing accident injury taken shortly after it occurred. Gruszecki stated that Nichole's injury did not appear to be bleeding "very much."

Lawrence Lee Renner, a forensic analyst, also testified on behalf of Payne. Renner explained what "confirmation bias"[14] meant, and then stated that he believed it was present during the investigation of Nichole's and Adam's deaths. Renner stated, "The officers that were interviewing [Payne], my impression of what I saw, was that they were convinced that he was the one that committed this crime and were not looking at other possibilities." Renner agreed with Martin that Nichole's death was a homicide and that Adam's death was a suicide.

Walter Henson, a manager over the Fingerprint Processing Bureau of the Texas Department of Public Safety, testified that he examined the rifle for trace evidence and DNA. Henson testified that he found no latent fingerprints on the firearm, along with "one unsuitable smudge on one of the spent casings," which was unidentifiable. Henson stated, "So traditionally you would expect if a firearm had been handled, there might be evidence that [it] had been handled in certain areas. There just wasn't anything like that that stood out, you know. It was pretty clean."

---

[14]According to Renner,

> I think confirmation bias is always present. It's a matter of looking at the evidence and letting the evidence guide the investigation rather than the officer making up his mind before he gets there or while he's there of what actually occurred and then only finding things that support his concept of the case.

Henson testified that if an individual "wiped the firearm down," it would preclude him from finding any prints or smudges.

### C. Payne's Interview with Investigators

The jury also viewed a taped recording of Payne's interview with investigators, which took place the afternoon of the incident. Payne explained to the investigators that Riley woke him up at approximately seven o'clock in the morning, whereupon he helped her get dressed. Payne then woke Joseph in order to take him to kindergarten. By this time, Adam was awake and "kind of ranting" about not being allowed to have a cell phone. Payne went outside with Joseph and Riley and put them in his truck to make the trip to school. Payne started the truck and waited for Adam. When Adam failed to join them, Payne exited the truck, went to the door of the residence, and informed Adam that if he did not get in the truck, he would leave him. After Adam failed to appear, Payne left the house and proceeded toward Joseph's school.

Payne explained to the investigators that after they left Joseph's school, he and Riley returned to the house around 8:15 a.m., pulled into the driveway, but then turned around to go to town to get bird seed.[15] About half-way to town, Riley informed Payne that she wanted to go to the park, so Payne turned back around to go back to the house to inform Nichole of their plans.[16] According to Payne, when the pair exited the vehicle, Riley decided that she would rather throw acorns in a creek located on the Payne's property. Payne stated that in addition to throwing acorns, the pair went to the barn, checked on the birds, and made sure the rabbit had water. Payne

---

[15]The family ran a small dove release business called Wings of Love.

[16]When investigators asked Payne why he did not use his cell phone to call Nichole, he stated that he knew she would be asleep and that she would not answer the telephone in the morning.

13

estimated they spent about twenty minutes in or around the barn. Payne told investigators that when he went back to the house to ask Nichole if they had any wild birdseed, he discovered Nichole's body. The record shows that Payne's call to 9-1-1 was made at 9:09 a.m.

Payne stated that he did not touch Nichole's or Adam's body and that he did not check to see if either of them were alive. When asked why he chose not to do so, Payne responded that he "don't know anything like that, I mean to -- I don't know nothing like that." Payne was unable to explain his reaction when he first saw Nichole or Adam, but he was fairly certain he did not scream. He repeatedly told investigators that he did not know what happened that day, what led up to the incident, or what he saw when he went into the house. The investigators reminded Payne that when he called 9-1-1 he informed the operator that "his wife and his son are both shot." They then asked Payne how he could have known they had been shot if he could not explain what he saw when he entered the home. Payne stated that he remembered the buckskin on the butt of the rifle, which was leaning on Adam's knee, but he was unable to explain how he knew Nichole had been shot.

Payne also told the investigators that Adam was "the average teenager," "maybe a little more kind of introverted," but that "everything was fine." He explained that Adam and Nichole's relationship was "normal." When asked if he believed Adam shot himself, Payne stated that he did not know. Payne informed the investigators that the family was free of financial problems because he had received a large personal injury settlement approximately seven months prior. He explained that the money had been used to purchase the family's home and three cars. Payne stated that he and Nichole seldom fought, having a small argument once a week, "just little

14

arguments here and there, nothing at all, I mean nothing, I mean just normal stuff." He informed the investigators that their last "falling out" had been "yesterday, the day before." Payne told the investigators that he owned several guns and that the weapon that had been used that day was his rifle, that he shot the rifle the evening before the incident, and that they would find his fingerprints on the rifle. When asked if he shot Nichole and Adam, Payne responded, "You've got to be out of your mind to think that I would have anything to do with this." "No, no, I had nothing to do with it."

**D.      Nichole's and Payne's Relationship**

Dmitri Nobles, Nichole's former boyfriend, testified that he had lived with Nichole and Adam in a house in Nacogdoches in 2005. Nobles and Nichole eventually went their separate ways and had no contact until August 2007, when Nichole contacted Nobles. During their initial contact, the pair spoke on the telephone for "a couple of hours." Nichole told Nobles that she had beautiful kids, a dream home, "and she was the unhappiest that she had ever been in her life." Nichole informed Nobles that she was going to "leave" but that she did not know how to go about leaving. Eventually, Nichole and Nobles began exchanging e-mails.

The State called Andrea Scott, who testified that Payne and Nichole were married within "two weeks or less" of meeting each other. She stated that her relationship with Nichole changed due to Nichole's relationship with Payne. Scott explained that while visiting Nichole at the Paynes' home, Payne approached Nichole while holding Riley and told Riley to tell Nichole that she hated her and to hit Nichole, at which time Riley did as Payne said. Scott testified that this type of thing happened on more than one occasion and that when it happened, it would upset Scott.

15

Scott stated that it was "[a]lmost impossible" to have a private conversation with Nichole when Payne was present. Scott explained that the children had a strict curfew and that Payne would not allow the children to leave their rooms after 8:00 p.m., not even to go to the bathroom. According to Scott,

> [Adam] came out of the bedroom to go to the bathroom, and Jason Payne immediately jumped up and ran over and pushed him up against the wall, put his hands around his throat, and then pushed up and got nose to nose with him and told him he couldn't go to the bathroom and sent him back to his room.

Scott stated that when Payne spoke to Adam, "[h]e was real aggressive, hostile towards him, very controlling, dominating."

On August 8, 2007, Scott had plans with Nichole to take her out to eat; however, Payne would not allow Nichole to leave their home. Scott described Payne's behavior on that day as "erratic, very agitated. He wasn't going to let her go." Scott invited Payne to come along to the restaurant, but Payne refused. Eventually, Scott was successful in getting Nichole out of the house to go to the restaurant. During the ride to the restaurant, Nichole informed Scott that she was planning on divorcing Payne. Nichole told Scott that she was "afraid" and "disgusted" with her relationship with Payne.

Jennifer Rogers Morton, a long-time friend of Nichole's, testified that her relationship with Nichole changed after Payne and Nichole were married. Morton explained that when she spoke to Nichole on the telephone, Nichole would tell her she was in the bathroom or in a closet. Nichole also informed Morton that she wanted a divorce from Payne. Michelle Beecham, who was also a long-time friend of Nichole's, testified that when she spoke with Nichole on the telephone, Nichole would be in the closet during the conversation and that she would whisper when talking.

16

Sherry Hawthorne, Nichole's mother, testified that in the last four years of Nichole's and Payne's marriage, she had almost no interaction with Payne, only on special occasions. After the Payne family moved to Quitman, Hawthorne had mostly telephone contact with Nichole. Hawthorne stated that Nichole would speak to her on the telephone from inside a closet or from her car in the driveway. Following Nichole's death, Hawthorne spoke with Payne, who "was making whimpering sounds and was saying that Nichole was his everything, crying sounds." Hawthorne testified that she asked Payne where Nichole's wedding ring was located, at which time his tone of voice changed completely. Payne explained that Nichole's wedding ring was "off for cleaning."

Hawthorne testified that on the sole occasion she administered Benadryl to Nichole, she slept for forty-eight hours. Hawthorne testified that she never gave Nichole Benadryl again because of her extreme sensitivity to it.[17]

Todd Wages, Adam's biological father, testified that Nichole interfered to a great degree with his visitation rights with Adam. Despite her interference, Nichole eventually informed Wages that Adam needed to live with him in Wages' home in Nacogdoches. Wages relayed Nichole's wishes to Adam, whereupon Adam indicated that he needed to be with his mother and that he would run away from Wages' home and back to Nichole's home if Wages forced him to stay in Nacogdoches. Wages asked Nichole what was happening in her home to make Adam feel that way, but Nichole refused to answer his question.

---

[17]The results of Nichole's autopsy showed that she had Tramadol (pain medicine), diphenhydramine (Benadryl), Citalopram (a type of prescription medication), and norpropoxyphen (a metabolite of a pain medication) in her system. With the exception of Benadryl, all of the medications were found to exist at normal therapeutic levels. The level of Benadryl was "a bit high, but certainly not one that would be considered toxic."

Dr. Aaron C. Polk, Jr., a family physician, testified that Nichole visited his office on March 20, 2007, complaining that she was depressed. After speaking with her, Polk diagnosed Nichole with situational depression and wrote her a prescription for the anti-depressant Cymbalta.

Erin Mitchell, a criminal investigator in digital forensics for the Attorney General's Office,[18] conducted a website history of a laptop computer found in Nichole's vehicle. Mitchell found, among other websites, "Houston divorce attorney family lawyer dot com" and "divorce net dot com." Mitchell also found websites related to the issue of child custody and multiple e-mails between Nichole and her former boyfriend, Nobel. In addition, Mitchell explained to the jury what "trash" or "waste basket" meant in terms of computer use, stating it "would be a temporary storage of sorts. Once you delete it, it goes into trash. It's kind of a method for just in case you accidentally delete something and you want to get it back. It gives you one more opportunity to get it back . . . ." Mitchell then went on to explain that she found emails between Nichole and Nobles on the laptop, which was used by Nichole and Payne. The emails were located in the "waste basket," and one email written by Nobles to Nichole stated, in part, "My day is already made before 9:30. You are good. Smiley face. Hmmm. I rated this PG, and with that, you are good. My statement, my imagination just took me somewhere else XXX smiley face. I've got things to do. You enjoy your day, ma'am. XO XO XO." There were also various emails and attachments sent from Nichole to Nobles which had been on the computer but were permanently deleted. From her investigation, Mitchell testified that Nichole and Payne used the same email address.

---

[18]Mitchell explained to the jury that "[d]igital forensics is a forensically sound method of analyzing and extracting data in its natural format. Meaning, we do not alter and/or even change the data."

Daniel Ashworth, Nichole's adopted son, testified on Payne's behalf. Ashworth explained that he had lived with the Payne family when they resided in Nacogdoches, prior to moving to Quitman. He lived with the family for seven years. Ashworth stated his relationships with Nichole, Payne, and Adam were "fine," "great." According to Ashworth, the family functioned as a normal family. Ashworth stated that Payne required the children to go to bed on school nights, but he did not recall having a curfew. According to Ashworth, Payne did not mistreat him, nor did he mistreat Nichole or Adam. Ashworth explained that it was not unusual for Payne to shoot guns with them while they were living in Nacogdoches and that he had seen Adam fire a .30-.30 rifle. Ashworth testified that he visited the Payne's home in Quitman a couple of months prior to the shootings and that they seemed happy. According to Ashworth, Payne and Nichole's relationship was fine, and he did not witness them having any disagreements.

### E. The Paynes' Finances

Stephen Thompson, a financial analysist with the Attorney General's Office, testified regarding Nichole's and Payne's finances. Thompson explained that the Payne's cash resources at the time of Nichole's death were extremely low, even to the point of having a negative bank account balance. Thompson explained that the Paynes' bank account documents represented "continuing expenses but no source of income to replenish the bank account balance." Thompson agreed that the Paynes' automobiles, home, some furniture, and a boat were all paid for in full, but also stated, "I would say a household with five or six people and no significant source of income is a -- it's a worrisome situation, yes."

19

M.D. Hightman testified that in 2007, Payne contacted him because he needed to sell his boat. Payne's original asking price for the boat had been $16,050.00, but in an effort to complete the transaction, Payne agreed to sell the boat for $13,000.00. Payne informed Hightman that he was "desperately needing the money" in order to purchase another boat.

Steve McComb, a State Farm Insurance agent, testified that at the time of Nichole's death, she owned a $100,000.00 life insurance policy in which Payne was the beneficiary. When McComb learned of Nichole's death, he filed a claim on the family's behalf. McComb attempted to contact Payne on multiple occasions in order to get a statement from him regarding Nichole's death, but was unsuccessful in his efforts. On cross-examination, McComb testified that Payne never pursued a claim as the beneficiary of Nichole's life insurance; however, Payne's mother eventually received the insurance proceeds.

### F. Adam's Behavior Shortly Before His Death

Brown, a teacher who regularly saw Adam at school, testified,

[Adam] was very respectful. He was a very sweet young man, always polite and courteous. He would stand there and wait until he was almost going to be tardy if I was looking the other direction and didn't see him, because he wasn't going to be rude and interrupt. And we got to where we talked all the time about being in the way.

Brown stated that she never observed Adam with a negative attitude. "It was always positive." Brown testified that Adam "was very mature for his age." When questioned about Adam's attitude during the days leading up to his death, Brown stated that she noticed no difference and that he was "[a]lways being polite and positive, and he continued to be that way until [she] didn't see him anymore."

20

Dana Hamrick, a counselor at Adam's school, testified that she came into contact with Adam on a regular basis. She stated that she saw Adam shortly before his death and that he was optimistic, cheerful, and looking forward to the future. Hamrick believed that Adam had plans to attend college. She testified, "[Adam] was a good solid student."

Jacob Montalvo, a high school classmate and friend of Adam's, testified that he met Adam in English class. Montalvo testified that Adam had asked him about college scholarships because Adam had plans to go to college. Montalvo stated that he went with Adam to talk to the school counselor and that she gave him a "big packet to fill out." Montalvo described Adam as "polite," "never rude," and "[e]asy to get along with." According to Montalvo, a couple of weeks prior to Adam's death, he spent the night at the Payne's home. Montalvo stated that Nichole was polite and introduced herself to him, but that Payne kept to himself. On one overnight visit, Payne told the boys that when they returned from the movie, they needed to go to bed early and "not make a bunch of noise" because if Payne heard anything, he would assume someone was attempting to break into the house and "he would take his gun and try to protect [against] anyone that tried to break in." Finding that to be a reasonable request, Montalvo complied.

### G.    Taped Conversation Between Payne and His Mother

The jury also heard recordings of two telephone conversations between Payne and his mother which took place while Payne was in jail awaiting trial. In the first telephone conversation, Payne referred to his mother's nightstand and asked her, "[A]re those two things still there?" When his mother informed Payne that "the two things" were in the nightstand drawer, Payne stated, "I want you to destroy those." Payne's mother responded by telling him that she needed to make

21

certain that she knew what he wanted her to destroy. She then asked, "Can you tell me?" Carefully choosing his words, Payne then asked his mother, "[I]s there two of the same thing in there?" He indicated that what he wanted her to locate was "made out of hard plastic." Payne's mother asked if what he was looking for belonged to Adam, to which Payne answered, "No." She then stated, "I've got the video of ya'll in Nacogdoches. You and Nichole." "This is the good one. I've got one that's bad, I got it in there." Payne stated, "There should be two of those in there." Payne's mother continued questioning him, at which time Payne stated, "You had three tapes. There were two that had nothing to do with anything and then there was one that was of me and Nichole." Payne's mother responded, "Yes, yes." He asked, "Where are the two [inaudible] with anything?" She responded, "They're in my closet." Payne then instructed his mother to go immediately to her closet to retrieve them. Payne asked, "Have you got them in your hand?" "Both of them?" His mother responded that she did. Payne stated, "I want you to just tear those up." After stating that she would, Payne instructed his mother to "like pull the insides out and then throw them on some leaves or something and burn it" and "do that as soon as we hang up." Payne's mother agreed to comply with his requests. Payne made a second telephone call to his mother and asked, "Did you take those things out?" She informed Payne that she had, stating, "You told me to and I did," to which Payne asked, "Did you burn it?" Payne's mother assured him that she had done as he had asked.

## II. Legal Sufficiency of the Evidence

### A. Standard of Review

In evaluating legal sufficiency in this case, we must review all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found, beyond a reasonable doubt, that Payne was guilty of capital murder. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19). Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

**B.      Discussion**

The theory of capital murder under which Payne was indicted and convicted alleged that

he intentionally and knowingly murdered more than one person during the same transaction.  *See*

TEX. PENAL CODE ANN. § 19.03(a)(7)(A) (West Supp. 2016).[19]  The offense of capital murder

incorporates the offense of murder in its definition.[20]

The indictment against Payne reads, in part:

[O]n or about the 11th day of December A.D. 2007, and before the presentment of this indictment, in the County and State aforesaid, JASON THAD PAYNE, hereinafter styled Defendant, did then and there intentionally and knowingly cause the death of an individual namely, [ADAM], by shooting him, and did then and there intentionally and knowingly cause the death of another individual, namely, NICHOLE PAYNE, by shooting her, and both murders were committed during the same criminal transaction;

And it is further presented in and to said Court that a deadly weapon, to-wit:  a firearm, was used and exhibited during the commission of the aforesaid offense or during immediate flight following the commission of the aforesaid offense, and that the defendant used and exhibited said deadly weapon or was a party to the aforesaid offense and knew that a deadly weapon would be used and exhibited.

---

[19]Section 19.03(a)(7)(A) states, "A person commits an offense if the person commits murder as defined under Section 19.02(b)(1) and: . . . (7) the person murders more than one person:  (A) during the same criminal transaction."  TEX. PENAL CODE ANN. § 19.03(a)(7)(A).

[20]An individual commits murder if he:

(1)      intentionally or knowingly causes the death of an individual;

(2)      intends to cause bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or

(3)      commits or attempts to commit a felony, other than manslaughter, and in the course of and in the furtherance of the commission or attempt, . . . he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

TEX. PENAL CODE ANN. § 19.02(b) (West 2011).

24

The State was required to prove beyond a reasonable doubt every element of the charge contained in the indictment against Payne. Payne maintains that the State failed in its endeavor.

### 1. Homicide-Suicide or Double Homicide?

The evidence presented at trial clearly demonstrated that Nichole's death was a homicide; however, whether Adam's death was a suicide or a homicide was a particularly significant issue at trial. Payne contends the evidence shows that Adam shot his mother and then committed suicide because (1) the medical examiner declared the manner of death of Adam as undetermined; (2) law enforcement officers believed Adam committed suicide; (3) the State's expert's explanation of the direction of fire, justifying a finding of homicide, was scientifically incompatible with his own blood-spatter analysis; and (4) Payne's experts' testimony showed that Adam committed suicide.

There is no question that the jury heard conflicting testimony regarding whether a murder-suicide had taken place or whether Nichole's and Adam's deaths were the result of a double homicide. In support of the latter, the State argued that Adam did not commit suicide after shooting Nichole based on (among other things) evidence presented by the State showing that: (1) when Nichole's body was found, it was warm and Adam's body was not; (2) the odor of gunpowder was detected in the room where Nichole was found, but was not detected in the garage where Adam was found; (3) a rifle is not normally used to commit suicide; (4) a self-inflicted gunshot usually results in a contact or near-contact wound, and Adam's wound was considered neither; (5) had Adam shot himself with a rifle, it would be unlikely that the weapon would have fallen between his legs; (6) the lack of fingerprints on the rifle was consistent with Payne wiping his fingerprints

25

off the rifle prior to placing it on Adam's lap; and (7) Adam was physically unable to fire the rifle from the calculated distance.

Payne presented expert testimony in an effort to refute the State's double homicide theory. It is well settled that the weight given to contradictory testimonial evidence is within the exclusive province of the jury because it depends on an assessment of credibility and demeanor of the particular witnesses. *Cain v. State*, 958 S.W.2d 404, 408–09 (Tex. Crim. App. 1997). As to this issue, the jury apparently gave more weight to the State's experts' testimony than it did to Payne's experts' testimony.

In addition to the State's experts' testimony, the jury heard from Adam's friends and teachers that shortly before his death, Adam was a happy, well-adjusted teenager who had plans to go to college after having been graduated from high school. Moreover, in Payne's interview with investigators, he stated that Adam was an average teenager and that Adam and Nichole had a normal mother-son relationship. The jury was allowed to infer from this evidence that Adam's behavior was not indicative of a person who intended to commit suicide, nor was it indicative of a son who had either a reason or a motive to murder his mother by shooting her at close range in the head with a rifle.

Thus, the State's experts' testimony, combined with the evidence regarding Adam's behavior just prior to the incident, led to the jury's determination that Adam did not commit suicide. We must defer to the jury's finding on this issue.

## 2.       Additional Evidence to Support Payne's Conviction

It is not enough for the jury to have determined that a double homicide took place.  The State was also required to prove beyond a reasonable doubt that Payne was responsible for Nichole's and Adam's deaths.  In making this determination, a court must review all of the evidence in the light most favorable to the prosecution.  *Jackson*, 443 U.S. at 319.  In an appellate court's review of the sufficiency of the evidence, it is not required to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt," it must determine only if a reasonable jury could have done so.  *Id*. at 318–19 (quoting *Woodby v. INS*, 385 U.S. 276, 285 (1966) (emphasis added)).

Payne contends, "The State's case rested entirely upon circumstantial evidence of marginal evidentiary value and expert testimony that is demonstrably unreliable.  The scientific evidence provided by the defense proves that [Adam] committed suicide . . . after shooting Nichole Payne, his mother, with the same rifle."  The jury disagreed with Payne's position, choosing to give more weight to the State's experts' version of events than it did to Payne's version, a decision we find to be reasonable and rational.  Therefore, we must now review the remaining evidence presented at trial, which as Payne points out, is mostly circumstantial.

Circumstantial evidence is as probative as direct evidence in establishing the guilt of the accused, and circumstantial evidence alone can be sufficient to support a verdict of guilt.  *Hooper*, 214 S.W.3d at 13.  In a circumstantial evidence case, it is not necessary that every fact and circumstance "point directly and independently to the defendant's guilt; it is enough if the conclusion is warranted by the combined and cumulative force of all the incriminating

circumstances." *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). Moreover, "[w]e permit juries to draw multiple reasonable inferences from facts as long as each is supported by the evidence at trial." *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and therefore defer to that determination." *Id.*

After thoroughly reviewing the record and giving due deference to the jury's verdict of guilt, for the following reasons, we conclude that the evidence in this case is sufficient to support Payne's conviction. First, during Payne's interview with investigators, he appeared to be less than forthcoming and offered several implausible and convoluted explanations as to what he and Riley had been doing after they dropped Joseph off at school that morning. Moreover, Payne's own timeline of events gave him sufficient time to kill both Nichole and Adam prior to placing the 9-1-1 call. Further, there was no evidence that any other person had been allowed into the Paynes' home the evening before, or the morning of, the incident, nor was there any evidence of forced entry into the home. From this evidence, it was reasonable for the jury to infer that Payne had the opportunity to commit the alleged offense.

In addition, Payne repeatedly stated that he did not remember what he saw when he entered the house; however, when investigators asked him how he knew to inform the 9-1-1 operator that Nichole had been shot, he had no explanation. Payne also admitted that he did not attempt to determine if either Nichole or Adam might still be alive, nor did he attempt to revive them when he discovered their bodies. The jury could have inferred from this evidence that Payne's version of events lacked credibility.

28

Further, Payne admitted in his interview that he and Nichole fought the day before her death. Despite this admission, Payne maintained that his relationship with Nichole was an amenable one and, in the event they did argue, it would have been over something insignificant. Contrary to Payne's assertions, the jury heard from several witnesses that Payne was a controlling person and did not want Nichole to have contact with her family or friends. This was so much an issue that Nichole was forced to hide inside closets or in her vehicle in order to speak to them on the telephone. In addition, the State presented testimony that Nichole was unhappy in her marriage and, at the very least, was considering divorce. Documentary evidence retrieved from Nichole's computer supported those witnesses' statements. The State also presented evidence that Nichole and Payne sent and received emails via the same email address. At the time the computer was analyzed, it contained two emails from Noble to Nichole that were readily available to be seen by Payne. When considering the evidence, it was reasonable for the jury to have inferred that Payne had been purposefully dishonest with the investigators about his relationship with Nichole and that he had a motive and the intent to commit the alleged crime.

In addition, Payne stated in his interview that the family was free of financial problems. The State's evidence showed that Payne and Nichole were experiencing financial issues, that the settlement proceeds had been completely depleted, and that Payne had no expected foreseeable income. The jury also heard evidence that Payne sold his boat for well under his original asking-price, which could further lead the jury to believe the family was in financial distress. Thus, the evidence presented at trial about the family's financial situation differed from the statements Payne

made to the investigators. The jury could have rationally inferred that Payne's statements during the interview lacked credibility and that he had a motive to commit the alleged crime.

In addition, the jury heard testimony regarding Nichole's life insurance policy and the fact that the insurance company repeatedly attempted to contact Payne without success. Because Payne refused to give a statement regarding the circumstances of Nichole's death, he never received the proceeds of Nichole's insurance policy; instead, his mother received the proceeds. The jury could have reasonably inferred from this evidence that Payne was involved in Nichole's death.

Further, the State presented uncontroverted evidence that the washrag found in Payne's truck contained Nichole's blood and gunpowder residue. However, the jury heard contradicting theories regarding how and when Nichole's blood came to be on the washrag, the State claiming the rag contained Nichole's blood as a result of Payne shooting her, and Payne claiming the blood had been on the rag for approximately two months as a result of a fishing accident involving Nichole.[21] Moreover, the jury heard contradicting theories as to how gunpowder residue came to be on the washrag. The State claimed that the washrag contained gunpowder residue as a result of the recent shootings, while Payne claimed that it was transferred during the investigation. A reasonable jury could have resolved this issue against Payne and in favor of the State, further implicating Payne in the crime.

The jury was also given the opportunity to listen to the recording of Payne's telephone call to his mother asking her to destroy tapes that were being kept at her home. Although there was no evidence as to the exact contents of the tapes, Payne informed his mother that he was only

---

[21]Notably, the jury was allowed to view a photograph of the washrag as it appeared on the day of the incident.

interested in destroying the tapes that related to Payne and Nichole. Moreover, Payne spoke to his mother a second time in order to find out if she had done as he had asked. A rationale jury could have inferred that Payne's statements demonstrated his attempt to destroy evidence of his guilt.

Lastly, the jury heard contradictory evidence relating to whether or not Adam committed suicide. After hearing all of the evidence, the jury determined this issue in the State's favor. When we begin with the jury's determination that Adam did not shoot himself, a reasonable jury could have concluded from the evidence that Payne shot Adam and then staged the scene to look as if Adam shot himself after shooting Nichole, all in an effort to dispel the fact that Payne shot and killed both of them.

It is well settled that "[w]hen the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and therefore defer to that determination." *Temple*, 390 S.W.3d at 360. In this case, although each piece of evidence, standing alone, is insufficient to support a guilty verdict against Payne, when considering the evidence in its totality, the jury could have found beyond a reasonable doubt that Payne was guilty of capital murder.

We overrule Payne's first point of error.

### III. The Trial Court's Admission of Adam's Demeanor and Character

Payne contends that the trial court abused its discretion when it allowed the State to present evidence relating to Adam's character and demeanor shortly before the day of the shootings. The State responds that because Payne's defensive theory was that Adam shot Nichole and then committed suicide, the State was entitled to offer evidence to demonstrate that Adam did not kill himself.

31

## A. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). We may not substitute our own decision for that of the trial court. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

## B. Discussion

Rule 404(a)(1) states, "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait." TEX. R. EVID. 404(a)(1). Although a homicide victim's state of mind prior to a fatal incident is generally neither at issue nor probative of any material question in a murder prosecution, there are exceptions to this rule.[22] *Norton v. State*, 771 S.W.2d 160 (Tex. App.—Texarkana 1989, pet. ref'd). For example, we have held previously that a homicide victim's state of mind may be probative of a material issue in cases where a defendant claims self-defense, accident, or that the victim committed suicide. *Anderson v. State*, 15 S.W.3d 177, 184 (Tex. App.—Texarkana 2000, no pet.).

Although more than one witness testified regarding Adam's demeanor and behavior just prior to his death, Payne complains specifically about Renee Brown's testimony. In summary, Brown testified that Adam always had a positive attitude, was mature for his age, and was

---

[22]"In a homicide case, the prosecutor may offer evidence of the victim's trait of peacefulness to rebut evidence that the victim was the first aggressor." *See* TEX. R. EVID. 404(3)(B).

respectful and polite. She was then asked if she noticed whether Adam's behavior had changed just prior to his death, to which she responded, "I never noticed anything different."

Here, Adam's personality traits and behavior were introduced to show that he did not appear to be suicidal around the time of his death. Testimony of any witness having knowledge that Adam was a well-adjusted and happy teenager at the time of the incident was admissible for the limited purpose of rebutting Payne's theory that Adam committed suicide.

We overrule Payne's second point of error.

## IV.    The Trial Court's Admission of the Jailhouse Recording

Payne contends that the trial court abused its discretion when it admitted recordings of two telephone conversations between Payne and his mother which took place during the summer of 2013. In both conversations, Payne asked his mother to destroy tapes that she kept in her home. Payne maintains that his statements were hearsay and that no hearsay exception applies.[23] The State responds that Payne's statements were not hearsay, but that even if this Court finds they were, the trial court did not commit reversible error by allowing them to be admitted into evidence.[24]

### A.    Standard of Review

We review a trial court's decision to admit evidence under an exception to the hearsay rule by employing the abuse-of-discretion standard. *See Zuliani v. State*, 97 S.W.3d 589, 595 (Tex.

---

[23]Hearsay is a statement, other than one made by the declarant while testifying at a trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Hearsay is not admissible unless it is permitted by statute or fits into an exception to the hearsay rule. *See* TEX. R. EVID. 802.

[24]At trial, the State argued the statements in the recordings should be admitted into evidence by virtue of the statement against interest exception to the hearsay rule.

Crim. App. 2003). Thus, a reviewing court shall not reverse a trial court unless a clear abuse of discretion has been shown. *Coffin v. State*, 885 S.W.2d 140, 149 (Tex. Crim. App. 1994). An abuse of discretion occurs "only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Cantu v. State*, 842 S.W.2d 667, 682 (Tex. Crim. App. 1992).

### B.      Discussion

The trial court found that Payne's statements in the jailhouse telephone recordings were hearsay, but fell under the "statement against interest" hearsay exception. While we disagree with the trial court's reasoning, the trial court did not err in admitting the telephone conversations. Rule 801(e)(2)(A) states that when a "statement is offered against an opposing party and:  (A) was made by the party in an individual or representative capacity," it is not hearsay. TEX. R. EVID. 801(e)(2)(A). The jailhouse recordings contained Payne's own statements, which were used against him by the State at trial. The recordings were not hearsay and were, therefore, admissible.

A trial court's decision to admit or exclude evidence may be upheld on any grounds supported by the record. *Hatley v. State*, 206 S.W.3d 710, 720 (Tex. App.—Texarkana 2006, no pet.). Payne's third point of error is overruled.

## V.  Conclusion

We affirm the trial court's judgment.


Bailey C. Moseley
Justice

Date Submitted:  January 18, 2017
Date Decided:  April 28, 2017

Do Not Publish